## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

ISAAK OLSON,

         *Plaintiff*,

       v.

ALEJANDRO MAYORKAS, KARL L.
SCHULTZ, and WILLIAM G. KELLY in
their official capacities,

        *Defendants*.

No.: 3:21-cv-1631

December 8, 2021

**COMPLAINT**

## INTRODUCTION

1.    Plaintiff Isaak Olson was just weeks away from graduating from the U.S. Coast Guard Academy ("Academy") with a Bachelor of Science degree in mechanical engineering and commission as an officer when he learned that he would be expelled, solely because he had become a parent.

2.    The Academy bans cadets who are parents. By rule, a cadet who becomes a parent while attending the Academy must be expelled, regardless of circumstances and without exception.

3.    Despite that Mr. Olson completed all requirements for his degree, the Academy denied Mr. Olson his commission, withheld his degree, and disenrolled him from the Academy, solely because he had become a parent.

4.    Defendants' refusal to grant Mr. Olson the degree and commission he had earned, solely because he became a parent, violated the Constitution and laws of the United States.

5.    The Academy's strict regulation prohibiting parents from being cadets forces

1

cadets like Mr. Olson to make an agonizing decision: either resign from the Academy and forfeit their college degree and commission as an officer in the U.S. Coast Guard, or remain enrolled but surrender their parental rights, terminate their pregnancy, or pressure their partner to terminate their pregnancy.

6.     While the military has repudiated many of its past discriminatory parenting and pregnancy policies in other contexts, this one endures at the Academy.

7.     The Academy's blanket ban on parents infringes on all cadets' constitutional right to parenthood and is based on outdated and harmful stereotypes about gender.

8.     Defendants violated the Fifth Amendment's guarantee of substantive due process and the Administrative Procedure Act when they disenrolled Mr. Olson after his completion of all degree requirements, refused to grant him his Bachelor's degree, withheld his commission, and denied his application to correct his military records to reflect that he had earned his degree and commission. In this action, Mr. Olson seeks declaratory and injunctive relief directing the Academy to end enforcement of its ban on parents and to grant him the degree and commission he earned.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

10.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general equitable powers of this Court.

11.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

12.    Plaintiff Isaak Olson was a cadet at the United States Coast Guard Academy. He is married to Tianellie (nee Galindo) Olson, and the father of their two young children.

13.    Defendant Alejandro Mayorkas, Secretary of Homeland Security, is sued here in his official capacity. Congress has authorized the Secretary of Homeland Security, acting through the Board of Correction for Military Records of the Coast Guard, to change any record of an Academy enlistee whenever necessary to correct an error or remove an injustice.

14.    Defendant Karl L. Schultz, Commandant of the United States Coast Guard, is sued here in his official capacity.

15.    Defendant William G. Kelly, Superintendent of the United States Coast Guard Academy, is sued here in his official capacity.

## STATEMENT OF FACTS

### A.    The United States Coast Guard Academy

16.    Established in 1876 and located in New London, Connecticut, the Academy is a prestigious military service academy that educates the future military leaders of the Coast Guard.

17.    Admission into the Academy is highly competitive. Each year, the Academy admits fewer than 300 cadets from thousands of applicants.

18.    Graduates of the Academy earn a bachelor's degree and a commission as an officer in the Coast Guard, which guarantees a position of leadership. Graduates of the Academy also have access to many coveted opportunities in the military and beyond.

19.    The United States government covers the costs and expenses of a cadet's education at the Academy, including tuition, books, and room and board. Cadets also receive a

salary while attending the Academy.

20.     Cadets enrolled in the Academy are subject to its Regulations for the Corps of

Cadets ("RCC"), which among other things set forth reasons why cadets may face disenrollment.

**B.     The Academy's Ban on Parents**

21.     The Academy imposes a blanket ban on cadets who are parents, regardless of

circumstances and without exception. Specifically, the Academy prohibits cadets from having

"any maternal or paternal obligation or responsibility at the time of appointment [] or while

enrolled as a Cadet." RCC § 2-D-4.b(7).

22.     Parents who apply to the Academy are ineligible for admission because of their

parenthood.

23.     Cadets who are enrolled and who incur a "parental obligation" must leave the

Academy, either by resigning or being disenrolled. For the purposes of the RCC, "[p]regnancy

past fourteen (14) weeks will be considered an obligation and will be applicable to both

prospective parents." *Id.*

24.     A cadet may apply to return to the Academy only "upon resolution of parental

responsibilities," termination of the pregnancy, or "irrevocabl[e] surrender" of parental rights

and obligations. *Id.*; *see also id.* § 3-I-1.

25.     The RCC does not provide any process for individualized consideration of a

cadet's circumstances or capabilities upon becoming a parent.

26.     The RCC authorizes the Superintendent to disenroll cadets who become pregnant

or parents without a hearing or other opportunity for the cadet to present a defense, or

determining whether the cadet can satisfy their educational requirements while a parent.

4

**C.      Isaak Olson's Tenure at the U.S. Coast Guard Academy**

27.      Isaak Olson was born in Los Angeles County, California in 1992. As a high school senior, he applied to the Academy because of his love of the sea and his desire to serve. When offered a placement as a cadet, he accepted.

28.      Mr. Olson and his wife, Tianellie Galindo, met while they were in high school. They decided to continue their relationship long-distance so that Mr. Olson could attend the Academy. The couple planned to marry after Mr. Olson received his degree and commission.

*1.   Isaak Olson's Early Years at the Academy*

29.      Mr. Olson reported to summer training at the Academy in June 2010.

30.      Mr. Olson's first summer and fourth class (freshman) year were physically, emotionally, and academically difficult. He relied on Ms. Galindo for emotional support, and she helped him navigate the Academy's challenges.

31.      Mr. Olson consistently met or exceeded expectations on his Cadet Evaluation Reports during his first three years. His GPA rose over the course of his first five semesters. He also was elected captain of the water polo team, and one supervisor reported that Mr. Olson "excelled at balancing academics, athletics, and division work."

32.      Mr. Olson received his first and only demerits during the spring semester of his fourth class (freshman) year, when a commander reported certain items out of place his barracks room. Nonetheless, he completed that semester with an 84 on his Cadet Evaluation Report, placing him in the "exceeds standard" for military performance.

33.      In April 2013, during his second class (junior) year, Mr. Olson learned that Ms. Galindo was 19 weeks pregnant. Mr. Olson had less than three weeks left in the school year.

34.      Mr. Olson and Ms. Galindo decided to continue the pregnancy.

35.      The couple was scared. They knew that marriage was prohibited under the

Academy's rules and worried about the stigma of having a child before marriage.

36.     Above all, the couple worried about how the Academy would react to Mr. Olson becoming a parent. Mr. Olson understood that the Academy expected him to "resign, be disenrolled, or . . . apply for a hardship resignation and apply for readmission upon resolution of parental responsibilities." RCC § 2-D-4.b(7).

37.     Mr. Olson also understood that if he resigned or was disenrolled at that time, the Coast Guard had the legal right to recoup the costs of his education, commonly believed to be as much as $500,000.

38.     To be eligible for readmission following a hardship resignation, Mr. Olson understood that he would have to legally terminate his parental rights and obligations. Specifically, Mr. Olson would have to prove that he "resolved" his parental responsibilities by submitting a certified court document or other legal documentation certifying that he had no parental obligations or that he had "irrevocably surrendered" his parental rights and obligations. *Id.* § 3-I-1.c(1)(a).

39.     As a result, Mr. Olson had only two Academy-sanctioned choices: he could (1) resign and give up everything he and Ms. Galindo had been working toward; or (2) surrender his parental rights. The couple could not bear to do either.

40.     Mr. Olson hoped that the regulation's sparse guidance and use of the permissive phrasing—*i.e.*, "may resign, be disenrolled, or may apply for hardship resignation"—meant that the Academy was encouraging cadets to exercise caution, rather than imposing a blanket ban on parenthood. *Id.* § 2-D-4.b(7). He also noted that the RCC ordered that "[c]adets are not required to self-incriminate." *Id.* § 4-G-7.

41.     Accordingly, because of the policy, Mr. Olson did not immediately disclose Ms.

6

Galindo's pregnancy to his chain of command.

42.     Keeping the pregnancy secret caused Mr. Olson significant stress and anguish. His GPA fell during the spring semester of his second class (junior) year, and just before his first class (senior) year, Mr. Olson was described as being "extremely introverted" during the summer cruise—leading the Commandant of Cadets to place him on a Suitability for Service probation for six months.

43.     On August 11, 2013, Ms. Galindo delivered their first child in California. Mr. Olson attended the birth and returned to the Academy a few days later to begin his final year as a cadet.

44.     After the birth, Mr. Olson returned to his prior strong performance at the Academy. He took on additional responsibilities and managed the Academy's intramural sports program. His GPA rose again during the fall and spring semesters of his first class (senior) year. He continued to meet standards on his Cadet Evaluation Reports. His Suitability for Service probation was lifted two months early, following positive reports from multiple officers.

*2.     Isaak Olson's Disenrollment from the U.S. Coast Guard Academy*

45.     In March 2014, as his graduation neared, Mr. Olson received tentative orders to report to the U.S. Coast Guard Cutter SPAR as his first duty assignment. He was instructed to complete the "OCONUS" (Outside Continental United States) screening application, which, among other things, required him to disclose whether he had dependents.

46.     This was the first time since the birth of his child that the Coast Guard had asked Mr. Olson if he was a parent. He promptly disclosed that he was.

47.     Upon receiving these orders, Mr. Olson met individually with the Academy chaplain, company chief, and company officer. By March 21, 2014, his full Academy chain of

command was aware that Mr. Olson was a parent.

48.     In an effort to satisfy Academy regulations, Mr. Olson and Ms. Galindo took steps to formally relieve Mr. Olson of his parental rights and responsibilities.

49.     On March 24, 2014, Ms. Galindo executed a notarized parental affidavit absolving Mr. Olson from "all parental rights and responsibilities while enrolled at the United States Coast Guard Academy." Mr. Olson delivered a copy of the affidavit to his chain of command.

50.     The couple also engaged a lawyer to submit a custody and visitation agreement in a California family court, stipulating that Ms. Galindo would have sole legal and physical custody of their child.

51.     On April 14, 2014, the Superintendent notified Mr. Olson that he would be disenrolled.

52.     Mr. Olson submitted a written appeal of the Superintendent's decision to CG-1, the Coast Guard's Chief of Human Resources.

53.     Mr. Olson collected statements from his military chain of command and advisors. His company officers, company chief petty officer, academic advisor, water polo coach, and the Chief of Cadet Training all asked the Superintendent to reconsider her decision. These officers, who were directly responsible for training and evaluating Mr. Olson, found him well-qualified for graduation and commissioning.

54.     Mr. Olson submitted his own statement to the Superintendent, explaining that Ms. Galindo had executed an affidavit that fully absolved him of "all parental rights and responsibilities." Mr. Olson also explained his dedication to the Academy and how he balanced the requirements of the RCC with his role as a parent.

55.     Mr. Olson submitted his written appeal on April 22, 2014.

56.     Mr. Olson was not afforded a hearing on his appeal.

57.     On April 24, 2014, Mr. Olson received notice that a California family court had, on the couple's application, granted Ms. Galindo sole custody of their child. The court order also "relieve[d] [Isaak Olson] of all obligations towards the minor child."

58.     The following day, the Coast Guard's Chief of Human Resources denied Mr. Olson's appeal. He explained: "[A]s the father of a child during your time at the Coast Guard Academy you became ineligible to maintain cadet status. . . . [Y]ou will not be commissioned as an Ensign in the U.S. Coast Guard or receive a degree from the Coast Guard Academy."

59.     Despite completing all degree requirements, the Academy prohibited  Mr. Olson from graduating with his class on May 21, 2014. The Academy refused to grant him his commission or his bachelor's of science degree in mechanical engineering.

60.     Ms. Galindo had already purchased a plane ticket to attend Mr. Olson's graduation. Though Defendants barred Mr. Olson from receiving his degree or participating the Academy's commencement ceremony, she still traveled from California to Connecticut with their son to help Mr. Olson cope with these heartbreaking developments.

61.     Because the Academy forbid him from graduating, Mr. Olson was still considered a "cadet" until the Academy took final disenrollment action. This left Mr. Olson in legal limbo as he planned for his wedding in June, because the RCC also prohibited Mr. Olson, as a cadet, from marrying.

62.     A few days before their wedding, the Academy granted Mr. Olson an exception to its ban on marriage and informed him that he could marry Ms. Galindo. They were married on June 7, 2014.

63.     On June 24, 2014, the Academy took final action to disenroll Mr. Olson without a degree or commission.

64.     Mr. Olson had only one option to continue his service—he could enlist as an E-3. He enlisted on June 24, 2014, the same day that Defendants disenrolled him.

    3.    *Isaak Olson's Actions Post-Disenrollment from the Academy*

65.     Mr. Olson reunited with his wife Ms. Galindo shortly after the Academy disenrolled him.

66.     They had a second child in May 2016.

67.     Following enlistment, Mr. Olson was stationed in southern California. He then assumed the role of division head directly responsible for coordinating over 40 visiting cutter movements. Mr. Olson acted as Motor Pool Fleet Manager and Special Events Coordinator.

68.     Mr. Olson was promoted to Aviation Maintenance Technician. He left his southern California station with a good conduct award and the Coast Guard achievement award. He was later stationed in Florida, and is now stationed in Alaska.

69.     On June 22, 2017, Mr. Olson applied to the Coast Guard Board for Correction of Military Records ("BCMR") on the ground that the Academy unlawfully refused to grant him the degree and commission he had earned. In particular, he requested that his military records be revised to show that he graduated from the Academy with a bachelor's degree in mechanical engineering; he was commissioned as an ensign in the Coast Guard with the same date of rank as his classmates; and that he is entitled to backpay and allowances.

70.     Mr. Olson contested the Academy's decision for a number of reasons, including that the Academy rules against parenthood are arbitrary, based on invidious social discrimination rather than the service's needs, and deprived him of substantive due process.

71.     The BCMR rejected Mr. Olson's application on August 31, 2018. A copy of the decision is attached here as Exhibit A.

**D.     The Lasting Harms of Isaak Olson's Disenrollment**

72.     At the time of his disenrollment, Mr. Olson believed he had to choose between becoming liable to pay back the full cost of his education or enlisting in the Coast Guard.

73.     Academy cadets disenrolled for being parents are in fact forced to choose between recoupment and enlistment if they are otherwise still able to serve.

74.     Mr. Olson chose to enlist. He continues to serve the Coast Guard as an Aviation Maintenance Technician, Second Class at Air Station Sitka (Alaska).

75.     Enlisting as an E-3 instead of commissioning as a Coast Guard officer has cost Mr. Olson professional opportunities and significant compensation with which to support his family.

76.      Mr. Olson never received his diploma. Without a degree, Mr. Olson is unable to commission unless selected from a competitive applicant pool to attend Officer Candidate School.

77.     Mr. Olson applied to Office Candidate School once, but was denied.

78.     Every month that Mr. Olson is enlisted and not an officer, he earns significantly less pay and Basic Allowance for Housing (BAH). At Mr. Olson's first duty station, he made approximately $1,319 less per month than would an officer at the same duty station.

79.     At the time of this filing, Mr. Olson and his family receive approximately $3,000 less per month than they would receive if he had been granted his commission as an officer. Every year that he is not commissioned as an officer, this difference in pay increases.

80.     If Mr. Olson received his bachelor's degree, he would be assigned a job with

greater responsibility than the one he holds as an enlisted Coast Guardsman and, in turn, gain greater leadership experience.

81.     Without his diploma and commission, Mr. Olson cannot become a senior officer in the Coast Guard. His career advancement as an enlisted Coast Guardsman is limited to the rank of E-9. This rank is lower than that of all officers.

82.     In his current job as an Aviation Maintenance Technician, Mr. Olson is still behind his peers who graduated from the Academy. Although they may sit on the same ship as him, they will always have more responsibility and influence over the Coast Guard.

83.     Should Mr. Olson leave the military, his career opportunities will be significantly limited by his lack of a college degree.

84.     Finally, Mr. Olson faces a stigma because of his disenrollment. For the rest of his career, Mr. Olson will be asked to explain why he was disenrolled from the Academy and why he did not obtain his degree.

### E.     The Lasting Harms of the Academy's Ban on Parents

85.     The Academy's ban on parents has had lasting harms for many other cadets.

86.     The Academy's ban has forced cadets to limit contact with or estrange themselves from their children and co-parents, involuntarily surrender their parental rights and responsibilities to avoid disenrollment from the Academy, and hide significant parts of their identities from their colleagues.

87.     The Academy's ban on parents has caused cadets to terminate their pregnancies or to pressure their partner to terminate a pregnancy for fear of disenrollment from the Academy.

88.     The Academy's ban led former cadets to designate an informal holiday known as "Conception Day"— marking fourteen weeks before graduation day, when cadets (or their

partners) no longer have to fear that becoming pregnant could lead to a violation of the RCC and disenrollment from the Academy.

89.     The Academy's ban on parents has forced cadets to drop out of the Academy and abandon their dreams of military careers.

90.     The Academy's ban on parents does not further and, in fact, undermines its mission to graduate cadets "with sound bodies, stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences and amenities, and strong in the resolve . . . ." RCC § 1-A-3.

91.     The Academy's ban also fails to serve its objectives to "provide, by precept and example, an environment which encourages a high sense of honor, devotion to duty, and respect for others," "provide a sound undergraduate education in a field of interest to the Coast Guard," and "provide athletic, professional and military training which enables graduates to assume their duties, upon commissioning, in operational billets." *Id.* § 1-A-4.

92.     The Academy's ban undermines its interests in promoting honor and loyalty by incentivizing cadets to surrender their parental rights to remain enrolled, or conceal their parental status.

93.     In addition, by forcing cadets to conceal their parental status, the Academy's ban makes it more difficult for cadets to establish the strong sense of trust and communication necessary to further the Academy's objectives to promote loyalty, obedience, leadership, and mutual respect.

94.     Open communication, honesty, and authenticity is critical to fostering team cohesion, leadership, trust, and morale in military settings.

95.     Following the federal government's repeal of its "Don't Ask, Don't Tell"

(DADT) policy preventing lesbian, gay, and bisexual troops from serving openly, for example,

research demonstrated that increased honesty and authenticity promoted increased

understanding, respect, and acceptance in the military. Aaron Belkin et al., *One Year Out: An*

*Assessment of DADT Repeal's Impact on Military Readiness*, Palm Ctr. (Sept. 2012).

96.     In addition, and as demonstrated by Mr. Olson's experience, families are positive

influences on military retention and success. Nat'l Academies of Sciences, Engineering, &

Medicine et al., *Strengthening the Military Family Readiness System for a Changing American*

*Society* (2019).

97.     Current and former faculty and staff members at the Academy are aware of

former cadets who revealed that they had children upon graduating and whose parenthood did

not compromise or interfere with the cadets' ability to excel and to fulfill their graduation

requirements.

98.     Critically, the Academy's regulations have not always operated as a categorical

ban on parenthood.

99.     When the Academy first published its restrictions on pregnancy and parenthood,

the Academy established a process for reviewing pregnancy and parenthood cases on an

individualized, case-by-case basis before a seven-person board. That process was discontinued.

100.    The Academy's current practice of automatic disenrollment, without any

individualized consideration, is neither necessary nor justified.

101.    Other cadets experience important and potentially distracting life events while

remaining enrolled. Familial relationships and obligations; romantic relationships; financial

distress; the incarceration, illness, or death of loved ones; and many other personal circumstances

may all occur while a cadet is enrolled at the Academy.

102.    However, none of these life situations is per se grounds for disenrollment.

103.    The current regulation against parenthood is arbitrary and capricious. It arbitrarily bans parenthood no matter the circumstance, without any individualized determination of a cadet's continued fitness or suitability for service, and is not in accordance with the regulations of the rest of the military.

104.    For example, while 22-year-old Mr. Olson was not permitted to have children as a *cadet*, a 22-year-old *enlisted* Coast Guardsman is permitted to have children.

105.    A 22-year-old Coast Guard *officer* is permitted to have children.

106.    A 22-year-old student enrolled in an *ROTC* program is permitted to have children.

107.    A 22-year-old Coast Guard *officer candidate* attending Officer Candidate School – located on the same New London campus as the Academy – is permitted to have children.

108.    Indeed, the rest of the military allows servicemembers to be parents, regardless of their age or responsibilities; whether they are officers, officers in training, or enlisted personnel; or the stress levels of their military jobs.

109.    The military has developed ways to prevent servicemembers' parental duties from negatively affecting their military duties. The active-duty component's Family Care Plan program, for example, establishes temporary guardianships for children with two servicemember parents who are deployed overseas simultaneously, as well as deployed single parents.

110.    The service branches have also established increasingly generous parental leave policies for active-duty personnel.

111.    The family demographics of today's military further disprove the Academy's assumption that family caregiving obligations are incompatible with military service. More than

one-third—or roughly 37 percent—of today's active duty servicemembers have children.

112.    The Academy's legacy ban on parenthood is not narrowly tailored to any governmental interest in fostering a loyal and cohesive corps of cadets. It is both underinclusive because it fails to consider other factors or circumstances that may and regularly do interfere with a cadet's concentration or performance, and overbroad because it bars all cadets from being parents, regardless of age, maturity, or circumstance.

### F.    The Academy's Ban Reflects a Long History of Discrimination Against Parents

113.    The Academy's ban on parents is outdated, unjustified, and rooted in harmful stereotypes. It sits within a long history of discrimination in military service academies.

114.    The Academy prohibited women from enrolling until 1976. Following its decision to allow women to enroll, the Academy adopted its first policies prohibiting parents from serving as cadets.

115.    Before the repeal of DADT in 2011, the Academy permitted lesbian, gay, and bisexual cadets only if they did not openly acknowledge their sexual orientation.

116.    The Academy's history reveals a longstanding reluctance to amend its policies and practices to reflect the cultural and legal norms and values in broader society.

117.    The Academy's regulations also impose a blanket ban on marriage or same-sex domestic partnership for cadets. RCC §§ 2-D-04.b(8)-(9).

118.    The Academy continues to maintain these bans even though other military institutions have eliminated their prohibitions on marriage. *See also O'Neill v. Dent*, 364 F. Supp. 565 (E.D.N.Y. 1973) (holding that the U.S. Merchant Marine Academy could not expel a cadet because he was married); Pub. L. 96-513, Title II, § 214, Dec. 12, 1980, 94 Stat. 2885 (repealing statute that allowed the Army to discharge officers due to marriage).

119.     The stereotypes underlying the Academy's ban have contributed to widespread discrimination and stigma against parents in the military and throughout the country. Since at least the 19th century, broad assumptions about parents—and specifically, women with children—have limited their participation in the military and in society.

120.     With the enactment of the Women's Armed Services Integration Act of 1948, for example, Congress authorized the enlistment and commissioning of women into the armed services but placed substantial restrictions on their roles. In doing so, members of Congress assumed that women could not join the armed services if they were responsible for the care of children, and that pregnant servicewomen would be discharged. In other words, Congress expected a woman to forgo or leave military service to carry out her expected role as a parent and caregiver.

121.     In 1951, Executive Order 10240 authorized the armed services to involuntarily discharge a woman who became pregnant, gave birth to a child, or became a parent by adoption or marriage. As many as 7,000 pregnant servicemembers were discharged as a result, while others were forced to terminate their pregnancies or place their children for adoption.

122.     By the mid-1970s, all regulations permitting discharge of servicemembers from the armed forces because of pregnancy or parenthood had been rescinded or struck down.

123.     Nevertheless, the Academy adopted its ban on parents only after women were admitted for the first time to the Academy in 1976.

124.     The Academy adopted this ban on parents based on a discriminatory assumption that parenthood would be more distracting for women than for men.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Fifth Amendment to the U.S. Constitution,**
**Deprivation of Protected Liberties in Violation of Right to Substantive Due Process**

125.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

126.    The Due Process Clause of the Fifth Amendment protects against government interference with fundamental liberty interests unless that infringement is narrowly tailored to achieve a compelling government interest.

127.    The right to have children, as well as the right to make decisions concerning the care, custody, and control of one's children, are fundamental liberty interests protected by the U.S. Constitution.

128.    The Academy's ban on parenthood, and Defendants' enforcement of the Academy's regulations, violate substantive due process by penalizing and excluding cadets solely based on pregnancy or parenthood without consideration of a cadet's individual circumstances or abilities.

129.    The Academy's sweeping and categorical ban on parenthood, without any individualized consideration of a cadet's circumstances, is neither rationally related to any legitimate government interest, nor narrowly tailored to further a compelling government interest.

130.    Defendants violated Plaintiff's fundamental rights to have and raise children by disenrolling him from the Academy solely because he had a child, without considering whether Plaintiff was otherwise able to fulfill his duties and satisfy the Academy's graduation requirements.

**SECOND CLAIM FOR RELIEF**
**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B)—Arbitrary and Capricious and Contrary to Constitutional Right**

131.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

132.    Mr. Olson has exhausted his administrative remedies.

133.    The BCMR's denial of Mr. Olson's application for relief is a final agency action.

134.    The Academy adopted its ban on parenthood in or around 1976, the year that women were admitted for the first time into the Academy.

135.    The Academy's ban on parenthood is arbitrary, capricious, and not in accordance with the policies on parenthood of the rest of the military.

136.    Because the BCMR's decision relied on regulations that are based on outdated and discriminatory notions about parenthood and sex stereotypes, and because the regulations are out of step with rules permitting officers, officer candidates, and enlisted personnel to be parents, the BCMR's decision constitutes arbitrary agency action, in violation of the APA, 5 U.S.C. § 706(2)(A).

137.    The Due Process Clause of the Fifth Amendment protects against governmental interference with an individual's fundamental rights to have children and to make decisions related to raising those children.

138.    Substantive due process protections of the Fifth Amendment require that a government policy that violates fundamental rights be narrowly tailored to serve a compelling state interest.

139.    Courts have held that similar bans on pregnancy and marriage by other military service academies and branches violate the Fifth Amendment because they constituted

unconstitutional discrimination. The Academy policy upon which the BCMR decision relies infringes on the constitutional rights to have and raise children and is not narrowly tailored to the governmental interests at stake.

140.    The BCMR decision is a violation of the APA's guarantee of constitutional agency actions in 5 U.S.C. § 706(2)(B).

<u>**REQUEST FOR RELIEF**</u>

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)    Issue a declaratory judgment that the challenged regulation is unconstitutional and that the BCMR decision violates the Administrative Procedure Act;

(2)    Direct, by issuance of an injunction, the Defendants to award Isaak Olson his degree, commission, and such other and further equitable relief this Court deems just and proper;

(3)    Vacate the challenged regulation and the BCMR decision, and remand to the BCMR with instructions to order the Defendants to award Isaak Olson his degree and commission;

(4)    Permanently enjoin Defendants from enforcing the challenged regulation; and

(5)    Grant such other and further relief this Court deems just and proper.

Dated: December 8, 2021
New Haven, Connecticut

Respectfully submitted,

By: /s/ Michael Wishnie

Yael Caplan, Law Student Intern[*]
Michelle Fraling, Law Student Intern[*]
Deepankar Gagneja, Law Student Intern[*]
Daisy Guilyard, Law Student Intern[*]
Meghan Brooks, ct31147
Michael J. Wishnie, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

Ria Tabacco Mar[†]
Linda S. Morris[†]
American Civil Liberties Union Foundation
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
rmar@aclu.org

Dan Barrett, ct29816
Elana Bildner, ct30379
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
Tel: (860) 471-8471
e-filings@acluct.org

*Counsel for Plaintiff*

---

[*] Motion for law student appearance forthcoming.
[†] Motion for admission *pro hac vice* forthcoming.