# EXHIBIT A

Office of the General Counsel
Board for Correction of Military Records
Mail Stop # 0485
245 Murray Lane
Washington, DC 20528



# Homeland
# Security

August 31, 2018

CHRIS TRIBOLET
105 LOCUST AVE.
LARKSPUR, CA 94939

Re:  Olson, Isaak E
     Docket No.  2017-193

Dear Messrs. Tribolet, Gigounas,  Medlong, and Fidell:

I enclose a copy of the Board's decision regarding the above-referenced application.  The appropriate officials of the Coast Guard have been notified of this decision and will take any action that is required by the Board's order.

If the Board has denied relief, the request for correction may be reconsidered if new materials that support the request and that were not previously presented to or considered by the Board are submitted.

Sincerely,

Julia Andrews
Chair

Enclosure
cc: Applicant
     Chief, Office of Military Justice (CG-0946)

# DEPARTMENT OF HOMELAND SECURITY
# BOARD FOR CORRECTION OF MILITARY RECORDS

Application for Correction of
the Coast Guard Record of:

**BCMR Docket No. 2017-193**

**OLSON, Isaak E.**

███████████

## FINAL DECISION

This proceeding was conducted according to the provisions of 10 U.S.C. § 1552 and 14 U.S.C. § 425.  The Chair docketed the case after receiving the completed application on September 8, 2018, and prepared the decision for the Board pursuant to 33 C.F.R. § 52.61(c).

This final decision, dated August 23, 2018, is approved and signed by the three duly appointed members who were designated to serve as the Board in this case.

### APPLICANT'S REQUEST AND ALLEGATIONS

The applicant, a former cadet of the Coast Guard Academy and current aviation machinery technician (AMT3/E-4), asked the Board to correct his record to show that he graduated from the Academy with a bachelor's degree in mechanical engineering in May 2014; he was commissioned an ensign in the Coast Guard with the same date of rank as his classmates; and he is entitled to back pay and allowances, and to grant any further relief necessary to make him whole.

The applicant explained that he was denied his degree and commission in May 2014, even though he had completed all of the requirements for graduation and commissioning, because he had become a father during his final year at the Academy as a first class cadet.  He stated that the dismissal process denied him due process and that "the Academy's policy requiring absolute termination of my parental rights in exchange for graduation and commissioning violate[s] substantive due process guarantees."  The applicant acknowledged that Academy regulations prohibit cadets from having legal obligations related to parenthood or marriage but argued that the policy is "seriously out of step with prevailing legal and social norms" and so the Board and the Department should repudiate it.

The applicant stated that he and his fiancé were shocked in April 2013 to learn that she was 19 weeks pregnant and so they were going to be parents in August.  Although they wanted to marry, the applicant knew he was not allowed to marry, and so they planned to wait until after he

graduated to marry. The applicant also consulted the cadet regulations, which state the following in pertinent part:

> 7. Paternity/Maternity/Pregnancy. A cadet may not have any maternal or paternal obligation or responsibility at the time of appointment nor while enrolled as a cadet. Pregnancy past fourteen (14) weeks will be considered an obligation and will be applicable to both prospective parents. A cadet who incurs a maternal or paternal obligation may resign, be disenrolled, or may apply for a hardship resignation to return upon resolution of parental responsibilities.
>
> 8. Marriage. … A cadet who marries … shall be disenrolled.

The applicant argued that this language suggests "a possibility he could remain a cadet" because it uses the permissive "may," instead of "shall be." The applicant alleged that he had heard rumors of other cadets who had married or were parents, and he knew that he was not required to self-incriminate. He also knew that if he resigned, his educational expenses—amounting to hundreds of thousands of dollars—would be recouped or he could be transferred into enlisted service. Therefore, he opted not to tell anyone—not even his brother, who was a member of the Coast Guard, or anyone in his family.

The applicant stated that his fiancé was in college in California, and she received prenatal care through her college and MediCal, a Medicaid program for people below the poverty line. The college also provided a "sponsor family," which gave her a place to live, a helping hand, and moral support. She had income from a part-time job, and the applicant bought her "odds and ends" with his cadet pay. When he and his classmates were offered $36,000 loans in May 2013, he got a loan and used the money to help his fiancé and buy her a car. When the baby was due in August 2013, he took leave and was present at his son's birth. He also visited them during winter break. Although he had been placed on performance probation in October 2013 "to address some introversion," after extra professional development assignments and at-sea training, he was removed from probation two months early by a Suitability for Service Board in January 2014.

The applicant stated that in March 2014 he received tentative orders to report to a cutter homeported in Alaska as his first duty assignment after graduation, and he was told to complete a screening application, which required him to disclose whether he was married or had dependents. He first met with the Academy chaplain and then with his company chief and his company officer. By March 21, 2014, his entire chain of command knew that he was a parent. On March 24, 2014, his fiancé executed a notarized affidavit absolving the applicant "from all parental rights and responsibilities while enrolled at the Coast Guard Academy. This includes the right to make decisions for the child, the duty to care for the child, and all financial responsibility including child support payment." She claimed to have sole legal and physical custody of the child.

Nevertheless, on April 14, 2014, the Superintendent of the Academy advised him that he would be discharged from the Academy "as a result of parenthood" that had made him unable to perform his duties. She also claimed that under California law he had "maintained his parental rights and obligation." The applicant argued that both of these contentions were wrong.

### *No Parental Obligations*

The applicant stated that the Superintendent erred in finding that he had parental obliga-
tions, but he received no hearing or even an opportunity to submit a statement to the Superinten-
dent. Instead, he was allowed to appeal the Superintendent's decision to the Coast Guard's Assis-
tant Commandant for Human Resources within five work days—by April 22, 2014. He requested
an extra week to prepare his appeal and prove that he did not have parental responsibilities because
"a civil action was underway in California and was expected to conclude soon; not later than April
28, 2014." The Commandant of Cadets refused to extend the appeal period but told him that any
subsequent changes to his parental obligations could be submitted when they became available.[1]

The applicant stated that for his appeal he collected statements from his chain of command
and advisors at the Academy, who all asked the Superintendent to reconsider her decision. They
wrote that the applicant's alleged parental responsibilities had not interfered with his being a suc-
cessful cadet and called him a great leader with dedication, perseverance, high ethical standards,
willingness to learn, and the potential to make an outstanding officer. The applicant also submitted
a letter explaining that his fiancé's affidavit fully absolved him of all parental rights and responsi-
bilities, that he had hired a lawyer to formalize this arrangement, and that a court order was
expected within days.

On April 24, 2014, the applicant claimed, a California State court approved a custody
agreement granting the mother sole physical and legal custody and relieving the applicant "of all
obligations toward the minor child." Therefore, he argued, as a matter of State law, he no longer
had any parental responsibilities. He immediately forwarded the court order through his chain of
command, but he does not know whether the Superintendent saw it before she forwarded his appeal
to Commandant (CG-1) by memorandum dated April 25, 2014. She recommended that his appeal
be denied and stated that the issue was "not necessarily a matter of conduct or honor, it
[parenthood] is just plain disqualifying." She noted that he had been a parent throughout his final
year, which made him ineligible for cadet status. She stated that his appeal should be denied
because it "would set a very bad precedent and be counter to the good order and discipline of the
Corps [of Cadets]."

The Assistant Commandant for Human Resources (CG-1) denied the applicant's appeal
because his parenthood had made him "ineligible to maintain cadet status." The applicant was
denied both a degree and a commission when his classmates graduated in May. Instead, after
being dismissed from the Academy, he enlisted on active duty. The applicant argued that the Coast
Guard's actions show that it erred in interpreting the Academy regulations. He stated that under
those regulations, the issue was not whether he was a biological parent but whether he had suffi-
ciently "resolved parental responsibilities" to be suitable for service. Based on the court order and
his performance record, the applicant argued, he would have been found suitable for service if the
Coast Guard had properly interpreted its own policies.

---

[1] This summary is taken from the applicant's attorney's brief. In his own statement, the applicant wrote that he had a
week to appeal and was given a few extra hours to submit his appeal after he requested a one-week extension.

### *Social Discrimination and No Service Need*

The applicant stated that the rule against cadets having dependents dates back to the 1897 rules for the cadets of the Revenue Cutter Service, which stated that "[t]he marriage of a cadet will be considered as equivalent to his resignation." The applicant stated that the rules have never explained this prohibition and argued that it "simply mirrored the norms of American society" at the time. At times, military officers have been prohibited from marrying during their first two or three years of service as an officer, and even in the civil service, certain positions were restricted to unmarried members. Military nurses could not be married, and many States prohibited teachers from marrying. The applicant stated that "discrimination against married persons was widespread." However, the applicant stated, military restrictions on marriage and parenthood have been disappearing. In 1958, the Court of Military Appeals struck down a Navy regulation requiring a six-month waiting period as an unreasonable interference in a member's right to marry.[2] In 1973, a Federal District Court found that the U.S. Merchant Marine Academy could not expel a cadet simply because he was married.[3] In 1975, the Second Circuit invalidated a regulation requiring the separation of pregnant Marines.[4] And in 1980, Congress repealed a statute that allowed the Army to discharge officers due to marriage.[5] The applicant noted that the restriction against marriage "also served as a regulation against parenthood" because of the stigmatization of having children born out of wedlock.

The applicant stated that when women were first admitted to the Coast Guard Academy in 1976, the Academy published its first policies against paternity, maternity, and pregnancy. Pregnancy and parenthood cases were to be reviewed by a seven-person board, and the cadet had a right to counsel, to present evidence, and to question witnesses. The board was to consider the cadet's ability to carry out the duties of a cadet, and there was no automatic disenrollment.

### *Lack of Due Process*

The applicant argued that the Coast Guard denied him due process because it enforced an *ultra vires* regulation, denied him a hearing, denied him a meaningful opportunity to present an appeal, and denied "review of his case at the level required by statute."

- *Ultra Vires* Regulation. The applicant argued that the cadet regulations are *ultra vires* because 14 U.S.C. § 182 states that "Cadets shall be subject to rules governing discipline prescribed by the Commandant," but since 1976, the rules about parenthood have been prescribed by the Superintendent, and the Commandant has never delegated his authority to the Superintendent "to regulate discipline generally, nor to regulate procreative rights of cadets specifically." The applicant argued that without a proper delegation, a policy interfering in a cadet's fundamental rights is not entitled to a presumption of validity. He also

---

[2] The applicant cited *United States v. Nation*, 26 C.M.R. 504 (C.M.A. 1958).

[3] The applicant cited *O'Neill v. Dent*, 364 F. Supp. 565 (E.D.N.Y. 1973) (finding that the Government had not presented sufficient evidence of the need for an absolute prohibition on married cadets to establish a fair and substantial relationship between the rule and the purpose of the academy or to survive strict scrutiny).

[4] The applicant cited *Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1975).

[5] Pub. L. 96-513, Title II, § 2141, Dec. 12 1980, 94 Stat. 2885.

argued that the policy for cadets is "at tension" with the Coast Guard's published policies on equal rights and is contrary to the rules for enlisted members and officers.

- <u>Summarily Dismissed Without Proper Authority</u>. The applicant claimed that he was not disenrolled but "summarily dismissed" from the Academy without proper authority. He stated that under 14 U.S.C. § 182(a), only the Secretary may summarily dismiss a cadet:

  > The Secretary may summarily dismiss from the Coast Guard any cadet who, during his cadetship, is found unsatisfactory in either studies or conduct, or may be deemed not adapted for a career in the Coast Guard.

  The applicant stated that while the term "dismissal" is usually associated with the punitive separation of an officer or cadet by sentence of court-martial,[6] the statutory history of 14 U.S.C. § 182(a) shows that "dismissal" means expulsion without trial.[7] The 1914, 1921, and 1947 cadet regulations for the Coast Guard Academy stated that married cadets "shall be dismissed," and the 1971 cadet regulations stated that they "shall be dismissed" if they do not resign. In 1977, the regulations were revised to state that a "cadet who is pregnant, who is to be the father of a child, or is the father or mother of a child, will be subject to disenrollment." The applicant claimed that currently the cadet regulations use the terms "dismissal" and "disenrollment" interchangeably and so the use of one term rather than the other does not change the analysis.

  The applicant claimed that the Secretary has not delegated his authority under 14 U.S.C. § 182(a). Under Delegation No. 0170.1, the applicant argued, the Secretary has delegated his authority only with respect to foreign cadets. And under Management Directive 3330, the Secretary delegated "responsibility for 'retention' of 'graduates' for 'commissioned service.'" However, he argued, "retention" is the opposite of "dismissal." The applicant argued that under 14 U.S.C. § 181, the Superintendent of the Academy is "the immediate government and military command" but lacks the authority to separate a cadet from the Coast Guard. He argued that the authority to summarily dismiss a cadet from the Academy is not included in § 181 and so rests with the Secretary under § 182. He also argued that the Commandant is not the "alter ego" of the Secretary,[8] and neither is the Superintendent.

- <u>Denial of Due Process under Fifth Amendment</u>. The applicant stated that he requested a hearing with the Superintendent, but his request was denied. He noted that the Academy has procedures that could have been implemented, such as the Suitability for Service Board

---

[6] *See, e.g.,* Rules for Court-Martial, 1003(b)(8)(A) (2012) ("There are three types of punitive separation. ... Dismissal applies only to commissioned officers, commissioned warrant officers, cadets, and midshipmen and may be adjudged only by a general court-martial."); UCMJ Art. 71(b), 10 U.S.C. § 871(b) (court-martial sentence of dismissal must be reviewed by the Secretary, or Appropriate Under Secretary or Assistant Secretary.).

[7] The applicant stated that in *Hartigan v. United States*, 38 Ct. Cl. 346 (1903), aff'd 196 U.S. 169 (1905), the court found that a cadet's summary dismissal from West Point by the President without a trial by court-martial was proper. He stated that in 1906 Congress authorized the Secretary (then of the Treasury) to "summarily dismiss from the Service any cadet who, during his probationary term, is found unsatisfactory in either studies or conduct, or may be deemed not adapted for a career in the Service."

[8] The applicant cited *Nolan v. United States,* 44 Fed. Cl. 49, 59 (1999).

he underwent in January 2014. But instead he was "summarily dismissed" even though Chapter 2-4-01.d. of the Regulations for the Corps of Cadets provides for hearings:

> Cadets will normally be afforded due process in the form of a hearing before the Superin-
> tendent makes a decision to terminate a cadet's appointment. The hearing may be achieved
> by a personal appearance before the Superintendent, an Executive Board, a Suitability for
> Service Hearing, a Commandant of Cadets Class 1 Hearing or a Cadet Honor Board. The
> due process hearing is not required before the Superintendent takes action to disenroll a
> cadet whenever the cadet fails to maintain published minimum standards (e. g. academic
> standards, physical fitness score, medical standards, excessive demerits, body weight, mar-
> riage, pregnancy, etc.). In these cases, the Superintendent will examine the record and
> effect the disenrollment by letter if, in the Superintendent's opinion, the cadet does not
> meet the retention standards of the Academy.

The applicant argued that the exception in this regulation by which he was denied a hearing does not meet the due process requirements of the Fifth Amendment. He noted that in *Hagopian v. Knowlton,* 470 F.2d 201, 206 (2d Cir. 1972), a cadet who was being dismissed for accumulating excessive demerits received review of his case by his chain of command followed by an Academic Board of eighteen top leaders, and the applicant was allowed to submit a written statement for consideration by the Academic Board. The Academic Board decided against him and three weeks later the Secretary of the Army approved his separation. The cadet sued in federal court, arguing that the lack of a hearing deprived him of due process. The court found that the cadet had been denied an adequate opportunity to present his defense in person, and he was reinstated at West Point.

The applicant noted that in *O'Neil v. Dent,* 364 F. Supp. 565, 570 (E.D.N.Y. 1973), the court stated with respect to a rule at the U.S. Merchant Marine Academy that "[t]he fatal vice of these anti-marriage school regulations, courts have held, 'lies in its sweeping, advance determination that every married student, regardless of the circumstances' must be expelled." The applicant also likened his case to that in *Crawford v. Cushman,* 531 F.2d 1114 (2d Cir. 1976), wherein the court overturned Marine Corps regulations that created an irrebuttable presumption that pregnant members were unfit for duty. The court required individual determinations of the women's fitness before and after childbirth.

The applicant argued that because he received no hearing, he did not receive an "individual determination" of his fitness to serve. He argued that he should have received at least the same process that the court found was due in *Hagopian,* especially since he had "completed 98% of the [Academy's] 200-week program"[9] and faced the loss of his degree and commission and the possibility of "compelled enlisted service" and recoupment of his educational expenses. Moreover, unlike the plaintiff in *Hagopian,* the applicant was not a troublemaker and truly wanted to serve in the Coast Guard. But he was not afforded counsel, was not allowed to submit evidence, and did not receive a hearing before a board or final review by the Secretary. The applicant concluded that since the court found that *Hagopian* was denied due process, he was clearly denied due process as well. He argued that if he had been given a hearing, he could have called witnesses and submitted documents to show that he had "no present legal obligations" preventing his successful completion of his education.

---

[9] The applicant quoted a letter from the Commandant of Cadets dated April 22, 2014, which was submitted with his appeal of his disenrollment.

- Denial of Meaningful Appeal Opportunity. The applicant stated that his right to appeal after the Superintendent decided to disenroll him was his first opportunity to submit evidence, but he "had no knowledge of what information the Superintendent had considered." He did not know if she was aware of the affidavit his fiancé had signed, the California court order, or the report of the Suitability Board that removed him from probation two months early. Her memorandum "seemed to rely only [on] the fact that he was a parent," and there was no procedural mechanism for him to learn what other evidence she considered or might forward with his appeal. He was allowed to submit a letter concerning extenuating or mitigating circumstances or reasons to retain him and to request letters from faculty, staff, and coaches, but he would not be allowed to see their letters. Therefore, he could not argue from or answer the evidence in those letters. Moreover, he alleged, their letters would not be forwarded with his appeal.

- Denial of Substantive Due Process. The applicant stated that the Academy rules require cadets to "extinguish their paternal rights," which deprives them of substantive due process. The rights to marry and rear children are among "the basic civil rights of man."[10] The cadet regulations in effect in 2014 prohibited him from having *any* parental obligation. In 2015, the regulations were revised to explain that a cadet's parental obligations continue until the cadet provides a "certified court document or other legal documentation authorized by state, district, or territorial law certifying that he/she has no dependents and/or obligations of parenthood or that he/she has irrevocably surrendered his/her parental rights and obligations."[11] The applicant argued that there could scarcely be a more drastic intrusion into someone's liberty than to require an "irrevocable surrender of parental rights." He argued that it is not enough to say that he waived his right in exchange for the privilege of attending the Academy: "The law is clear that 'though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.'"[12] The applicant argued that instead of requiring such an irrevocable waiver, the Coast Guard could require a "dependent care plan" of the sort required for unmarried parents who apply for a commissioning program" or convene a board to determine the cadet's ability to carry out his cadet responsibilities." The applicant alleged that if such procedures had been in effect, he would have graduated.

The applicant claimed that prohibitions on cadets' and trainees' marriage and parenthood are disappearing and that both West Point and the Air Force Academy have allowed parents to graduate. Citing a May 6, 1998, article in the *Washington Post,* which he did not submit, the applicant stated that when two seniors at West Point had a child, married, but then had the marriage annulled, West Point allowed the male to graduate and would allow the female to graduate if she gave up custody of the child. And he claimed that at the Air Force Academy, two cadets were allowed to graduate when the mother's mother took care of their child, citing the July 12, 2012, edition of the *Colorado Springs Gazette,* which he did not submit. The applicant claimed that the

---

[10] The applicant cited *Skinner v. Oklahoma,* 316 U.S. 535, 541 (1942).

[11] Regulations for the Corps of Cadets § 3-9-01.c.1.(b) (2015).

[12] The applicant cited *Perry v. Sindermann,* 408 U.S. 593, 597 (1972).

standard applied to those cadets was the ability to meet graduation requirements and that the same standard should apply at the Coast Guard Academy.

The applicant stated that he also met "all published requirements" for the award of his diploma and receipt of his commission. He passed every course in the core curriculum; passed at least 37 courses of 3.00 credits or greater; completed the academic requirements for his major; attained an average of at least 2.00 in all upper division required courses for his major; attained a cumulative grade point average of at least 2.00; attended the Academy for four years; completed the required physical education program and swimming and fitness tests; and met "all military performance standards, demonstrating all aspects of personal and professional development necessary to serve" as an ensign. Therefore, he concluded, he should have been awarded a diploma with his class and received his commission, and the Board should correct these errors and award him back pay and allowances.

## SUMMARY OF THE RECORD

The applicant entered the Coast Guard Academy as a cadet in the summer of 2010. As a fourth-class cadet in the fall of 2010 and spring of 2011, he received good marks on his Cadet Evaluation Reports (CERs), which evaluated his performance of military duties, such as being a "follower," assimilating into military life, teamwork, cleaning, watchstanding, and other non-academic duties, on a scale of 1 (worst) to 7 (best) in ten performance dimensions. He received his first and only demerits while at the Academy when his room was not in order upon inspection on March 24, 2011. His GPA at the end of his first year was 2.84.

The applicant also received a good CER during summer training aboard the CGC Eagle in the spring of 2011 and was described as a hard worker with a good attitude who was diligent in pursuing qualifications and interacted well with the division. His supervisor stated that the applicant was "prompt and professional in his duties and reported back early on assigned tasks." His CER following training aboard another cutter for five weeks in the summer of 2011 was also good. His supervisor noted that he had quickly qualified at the helm and as a lookout, took the work seriously and enthusiastically, and performed well at the watch station, and the reviewer stated that he had "all the qualities desired of a junior officer."

The applicant received good CERs as a third-class cadet. On his Fall 2011 CER, his rating chain stated that he consistently looked out for the well-being of others and served as a good role model. On his Spring 2012 CER, his rating chain stated that he had "demonstrated the highest qualities of professionalism, responsibility, and communication." The applicant's GPA at the end of his second year was 2.86.

On his CER documenting his performance in the summer of 2012, the applicant received high marks. His supervisor stated that he brought enthusiasm to his work and was "highly suggested for higher leadership opportunities among [his] company, should he so desire."

On his Fall 2012 CER, his supervisor wrote that throughout the semester, the applicant had taken "the lead and was seen directing the fourth class under his own initiative in what they needed to get accomplished. MBR always came to formation with a smile no matter what was going on

that day." The reviewer stated that the applicant had "excelled at balancing academics, athletics, and division work. ... Mbr should focus on continuing to improve his communication skills and spending time getting to know his division." The applicant's semester GPA was 3.25, and his cumulative GPA rose to 2.93.

### Performance with Parental Obligations

According to the applicant, he learned of his fiancé's pregnancy in April 2013. His semester GPA fell to 2.22, and his cumulative GPA dropped to 2.82. His marks on his Spring 2013 CER were also lower. His supervisor noted that he "could work on being more outspoken and communicating more." The reviewer concurred and stated that the applicant should also "strive to develop his leadership capabilities in the upcoming summer and academic year."

As a first-class cadet during the summer before his final academic year, the applicant served aboard a cutter and received very low marks on his CER. On the 1-to-7 scale, he received five low marks of 3 for followership, results/effectiveness, self-confidence and assertiveness, effectively managing time, and effective communication and five middle marks of 4 for military deportment, teamwork, commitment to the Coast Guard, application of the Core Values, and professional relationships. On another part of the CER, he received an unsatisfactory leadership mark (a mark of 0 on a scale from 0 to 3) and low marks of 1 for honesty & integrity, attitude, responsibility, teamwork, and health & fitness. His reviewer commented that he had been "extremely introverted," while his supervisors wrote the following comments:

> During summer training period, mbr barely met the standards set for the swabs [fourth class cadets who have not yet begun classes at the Academy]. Mbr did well physically and maintained a good uniform. However mbr was unable to learn indoc. Mbr remained on four meals in advance for most of the summer and despite counseling, did not demonstrate initiative to improve. Mbr was easily flustered and demonstrated a negative attitude when mbr's poor performance is addressed. Mbr had expressed difficulty in memorization, but did not get help from shipmates and held division back. This encapsulates much of mbr's behavior over summer. Mbr seemed distracted whenever talking with upperclass as well. If mbr is to succeed, mbr will need to learn to get help from shipmates and clearly show that mbr can take the initiative to improve. Mbr has shown that mbr is capable of performing well but seems to choose when to perform based on when it is convenient. Mbr needs to make good on the skills learned over the summer to prove mbr's desire to be a cadet.

> [The applicant] failed to meet the expectations acting under the junior officer role during his 1/c summer onboard [a cutter]. He was not proactive in attaining sign-offs [qualifications] and did not complete assigned tasking to him under the engineering department throughout the [District] patrol. He was assigned to each engineering division and he failed to involve himself with any work or interact with the division members. He did not interact with the wardroom or the crew. His major accomplishment was getting U/W [underway] security qualified. [He] has potential to become an effective officer in the fleet; however it is highly recommended that he works on his teamwork and interpersonal skills in his last year at the Academy and shows more "initiative."

The CER also included a scale showing that because he scored 60 out of a 100, he was overall in the "meets expectations" range of 59 to 79.

The applicant's son was born on August 11, 2013.

On October 18, 2013, as a result of his poor performance over the summer, the applicant was placed on Suitability for Service probation for six months and given extra training and mentoring. He was advised that he would likely be disenrolled if he committed a Class One offense, brought discredit to the Coast Guard, or behaved in a manner inconsistent with the Coast Guard's Core Values of Honor, Respect, and Devotion to Duty.

On his Fall 2013 CER, the applicant received better marks. His rating chain stated that he was "responsive to all forms of feedback"; had worked hard; had pushed other members to step into roles to help the corps function; maintained a positive attitude; got along well with others; and showed great promise and potential as a junior officer. However, the applicant's semester GPA was 2.56, which lowered his cumulative GPA to 2.79.

At a Suitability for Service hearing on January 17, 2014, the board recommended that the applicant be removed from probation. The board determined that the applicant had taken his probation "very seriously" and made continual improvements. He had received extra guidance and shown "stellar commitment and ownership" in rewriting the Regimental Intercompany Sports policy. The board also noted that during a special two-week underway period during winter break, the applicant had "exhibited more extroverted and engaged professional interactions." The board's recommendation was approved by the Commandant of Cadets.

### Revelation of Paternal Obligation and Disenrollment

On March 24, 2014, the applicant's fiancé (now wife), signed the following notarized statement, which he delivered to his chain of command:

> I, ..., recognize that 1/c Cadet [applicant] is the biological father of my dependent, ..., and hereby fully absolve 1/c Cadet [applicant] from all parental rights and responsibilities while enrolled at the Coast Guard Academy. This includes the right to make decisions for the child, the duty to care for the child, and all financial responsibility including child support payment. I, ..., have sole legal custody, meaning the right and responsibility to make decisions for the child relating to the health, education, and welfare of the child. I also have sole physical custody, meaning that the child resides with me and is under my supervision.

On April 11, 2014, the Commandant of Cadets sent the Superintendent of the Academy, a rear admiral, a memorandum recommending that the applicant be disenrolled for failure to adhere to regulations. The Commandant of Cadets stated that on March 21, 2014, the applicant had revealed, pursuant to the completion of overseas transfer paperwork, that he had parental obligations to a child who was seven months old. The obligations had been confirmed upon review of the birth certificate. The Superintendent also reported that the applicant ranked 174 in a class of 227; had a cumulative GPA of 2.79 and a GPA of 2.56 for the prior semester (Fall 2013); was majoring in mechanical engineering; and was on the men's water polo team.

On April 14, 2014, the Superintendent notified the applicant of his pending disenrollment due to parenthood:

> 1. As a consequence of your parenthood, you are no longer eligible to be a cadet at the United States Coast Guard Academy, and will be disenrolled. You will be discharged with your character of service listed as honorable  You will receive the following separation code on your DD-214: JDG (involuntary discharge directed by established directive (no board entitlement) when

as a result of parenthood or custody of minor children are subject to inability to perform pre-scribed duties, repetitive absenteeism or nonavailability for worldwide assignment).

2.  In August 2013 your child was born in California and the birth certificate names you as the father.  Since that time, you have maintained your parental rights and obligation established by California law.  On 21 March 2014 you revealed to your Company Officer and Company Chief that you have parental obligations to a child that is approximately seven months old.  This notification was the direct result of having to reveal dependents via the overseas paperwork for your permanent change of station to Alaska after commissioning.  Cadet parental obligations are prohibited per [the Regulations of the Corps of Cadets, SUPTINST M5215.2 (Spring 2011)].

3.  You have the right to appeal this action to my superior, Commandant (CG-1), within five (5) working days of receipt of this letter.  Your appeal must be submitted in accordance with [the Regulations of the Corps of Cadets].  You may consult with your Company Officer or your Company Chief before deciding to submit an appeal.

On April 21, 2014, the Commandant of the Coast Guard informed the applicant that his request for an extension had been disapproved.  He noted that the applicant could submit another request for an extension but had to provide justification for the extension.

### Applicant's Appeal of Disenrollment

On April 22, 2014, the applicant submitted a request for a five-day extension.  He stated that he needed an extension because his attorney was "process[ing] custody paperwork with the state of California.  This process began this last Friday [April 18, 2014] and is forecasted to be complete NLT Monday 28 Apr 2014."  At 9:17 a.m., the Commandant of Cadets denied the five-day extension but wrote that "any subsequent changes to present parental obligations may be sub-mitted for consideration when available but do not change your present ineligibility to remain a cadet.  Your deadline to submit an appeal is extended to 0800 23 APR 14."

On April 22, 2014, the applicant submitted his appeal of the Superintendent's decision to disenroll him.  He claimed that the regulations were unclear about what the Academy should do upon learning about a cadet's dependent.  He also complained that although the regulations stated that the cadet could apply for a hardship resignation and return "upon resolution of parental respon-sibilities," the regulations did not explain how to resolve those responsibilities.  He noted that the regulations state that before requesting a hardship resignation, cadets should "make every effort to resolve hardships without resorting to resignation" and claimed that he had tried to do this by not letting his parenthood delay his education.  He also claimed that his parental responsibilities had been resolved to the best of his ability.  He stated that upon learning of the pregnancy, he had made an oral agreement with his fiancé, the mother, that she would have sole custody of the child and make all decisions regarding the child's health and welfare.  He stated that she absolved him of all parental rights and responsibilities, including the duty to care for and protect the child and to pro-vide financial support.  After he informed his chain of command about his parenthood, his agree-ment with the mother put in writing and notarized.  He stated that the child was not his dependent and that he had paid no child support, had no custody, and provided no health care.  In addition, he noted that his attorney had filed for a custody order to "show the dissolved dependency.  This will absolve me of all custody rights and obligations."  He stated that he expected the court to issue the order no later than Monday, April 28, 2014.

The applicant wrote in his appeal that he had given up his parental rights and responsibilities to try to do the right thing for his future wife and future child. He devoted himself to graduating from the Academy so that he could serve his country and do right by his family, the Coast Guard, and himself. He thought that if he did not graduate, he would have wasted the Coast Guard's time, effort, and money.

The applicant wrote that he had been told that the cadet rules prohibited marriage and children because they would be a distraction. He claimed that he had maintained his grades, captained the men's water polo team, and rewritten the Regimental Intercompany Sports policy. He argued, "If I can manage to do well academically, athletically, and militarily while managing to be somewhat of a father figure to my son, I can do anything." Regarding his poor performance in the summer of 2013, the applicant wrote that he had worked with his training officer and figured out that the root of the problem was a "communications issue" and that he had read, learned, and trained to overcome the problem. He noted that he had been assigned to a cutter for two weeks during winter break and proven that he had overcome the problem.

The applicant wrote that it had always been his dream to serve his country, but he realized that he faced disenrollment. He asked to be retained based on his record and references but, if not retained and commissioned, he asked to be enlisted. The applicant also asked to meet with the Superintendent to discuss the appeal.

At the applicant's request, several officers at the Academy submitted letters of support praising—variously—his attitude, hard work, dedication, reliability, responsiveness, communications, leadership, maturity, honesty, and courage. Some stated that he had overcome his disappointing performance on the cutter during the summer, and some stated that he had not allowed parental obligations to interfere with his ability to succeed as a cadet. They supported his retention.

On April 24, 2014, a judge of the Superior Court of the State of California signed an order regarding a "Custody and Visitation Agreement" between the applicant and his fiancé, which provided the following:

- They had one child born on August 11, 2013.

- The mother "shall exercise Sole Legal Custody" over the child.

- The mother "shall have Sole Physical Custody" over the child, but the father (the applicant) "shall have a reasonable right to visitation, by agreement between the parties."

- "The Parties agree that this agreement is NOT intended to be a Final Order pursuant to the holding in *Montenegro v. Diaz* (2001), 26 Cal. App. 4th 249. This agreement is deemed modifiable by either party without a showing of changed circumstances. It is the intent of the parties that his order be made as a Temporary Order, and is entered as the order of the Court without any prejudice to Father whatsoever."

- "Petitioner and Respondent agree that as part of this Stipulation, neither party is requesting child support at this time. The parties agree that it is in the best interest of the child that no support order be entered as a support order would significantly impact Petitioner's earning

capacity, which would be detrimental to the child.  This Stipulation will relieve Petitioner of all obligations towards the minor child."

- The Order states, "To the extent that the parties agree, the Court makes those Agreements the Order of the Court."

On April 25, 2014, the Superintendent forwarded the applicant's appeal to the Assistant Commandant for Human Resources (CG-1) and recommended disapproval.  She attached the applicant's record and stated that the following:

> 2.  Unfortunately, [the applicant] has violated the "terms of employment" as a cadet in the United States Coast Guard.  This is not necessarily a matter of conduct or honor; it is just plain disqualifying.  As the father of a child, he is ineligible for cadet status.
>
> 3.  [The applicant] has hired counsel to try to legally separate himself from the dependency, but the fact remains that for his entire first class year he was a father which renders him ineligible for cadet status. As an aside, he intends to wed the mother, his fiancé, in June.
>
> 4.  Retaining [the applicant] would set a very bad precedent and be counter to the good order and discipline of the corps.
>
> 5.  [The applicant] indicates in his appeal letter that he desires to enlist if he is not retained as a cadet.  I strongly recommend we lateral him over direct to OS "A" school [to become an operations specialist] or as a second option, direct to recruit training as we did in the case of Cadet … (who graduated as honor graduate [at recruit training]).  Given [the applicant] has four years of military training, including swab summer, direct to "A" school is the best choice.  From this status, he could compete for OCS [Officer Candidate School] at some point should he so desire.

On May 14, 2014, the Assistant Commandant for Human Resources advised the applicant that after carefully reviewing his appeal package, the Superintendent's recommendation, and his performance record, his appeal of the Superintendent's decision to disenroll him was denied.  He stated that as the father of a child, he had become ineligible to maintain cadet status.  He stated that the applicant would be allowed to complete his courses (to receive the credits) but would not receive a degree from the Academy or a commission as an ensign.  He offered the applicant the opportunity to enlist as an E-3 and to attend the next OS "A" school with an opening.  He stated that if the applicant wanted to enter a different rating, he would be enlisted as an E-3 and assigned to a vacant billet in the field.  He could then submit a request to attend the "A" school of his choice.

The applicant did not graduate with his class on May 21, 2014, and did not receive a commission.  He received 145.25 total credit hours with a cumulative GPA of 2.77.  In early June, he was granted leave to get married.  He was discharged on June 23, 2014, and immediately enlisted as an E-3.  He subsequently attended AMT "A" school and is now an AMT3/E-4.  Because he enlisted, he was not required to repay the cost of his education at the Academy.

## SUMMARY OF APPLICABLE STATUTES AND POLICY

### Title 14, United States Code

Title 14 U.S.C. § 181, "Administration of Academy," states the following:

The immediate government and military command of the Coast Guard Academy shall be in the Superintendent of the Academy, subject to the direction of the Commandant under the general supervision of the Secretary. The Commandant may select a superintendent from the active list of the Coast Guard who shall serve in the pleasure of the Commandant.

Title 14 U.S.C. § 182, "Cadets; number, appointment, obligation to serve," states the following:

(a) The number of cadets appointed annually to the Academy shall be as determined by the Secretary but the number appointed in any one year shall not exceed six hundred. Appointments to cadetships shall be made under regulations prescribed by the Secretary, who shall determine age limits, methods of selection of applicants, term of service as a cadet before graduation, and all other matters affecting such appointments. In the administration of this chapter, the Secretary shall take such action as may be necessary and appropriate to insure that female individuals shall be eligible for appointment and admission to the Coast Guard Academy, and that the relevant standards required for appointment, admission, training, graduation, and commissioning of female individuals shall be the same as those required for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals. <u>The Secretary may summarily dismiss from the Coast Guard any cadet who, during his cadetship, is found unsatisfactory in either studies or conduct, or may be deemed not adapted for a career in the Coast Guard. Cadets shall be subject to rules governing discipline prescribed by the Commandant.</u> [Emphasis added.]

(b) Each cadet shall sign an agreement with respect to the cadet's length of service in the Coast Guard. The agreement shall provide that the cadet agrees to the following:
    (1) That the cadet will complete the course of instruction at the Coast Guard Academy.
    (2) That upon graduation from the Coast Guard Academy the cadet--
        (A) will accept an appointment, if tendered, as a commissioned officer of the Coast Guard; and
        (B) will serve on active duty for at least five years immediately after such appointment.
    (3) That if an appointment described in paragraph (2) is not tendered or if the cadet is permitted to resign as a regular officer before the completion of the commissioned service obligation of the cadet, the cadet--
        (A) will accept an appointment as a commissioned officer in the Coast Guard Reserve; and
        (B) will remain in that reserve component until completion of the commissioned service obligation of the cadet.

(c)(1) The Secretary may transfer to the Coast Guard Reserve, and may order to active duty for such period of time as the Secretary prescribes (but not to exceed four years), a cadet who breaches an agreement under subsection (b). The period of time for which a cadet is ordered to active duty under this paragraph may be determined without regard to section 651(a) of title 10.
    (2) A cadet who is transferred to the Coast Guard Reserve under paragraph (1) shall be transferred in an appropriate enlisted grade or rating, as determined by the Secretary.
    (3) For the purposes of paragraph (1), a cadet shall be considered to have breached an agreement under subsection (b) if the cadet is separated from the Coast Guard Academy under circumstances which the Secretary determines constitute a breach by the cadet of the cadet's agreement to complete the course of instruction at the Coast Guard Academy and accept an appointment as a commissioned officer upon graduation from the Coast Guard Academy.

(d) The Secretary shall prescribe regulations to carry out this section. Those regulations shall include--
    (1) standards for determining what constitutes, for the purpose of subsection (c), a breach of an agreement under subsection (b);
    (2) procedures for determining whether such a breach has occurred; and
    (3) standards for determining the period of time for which a person may be ordered to serve on active duty under subsection (c).

(e) In this section, "commissioned service obligation", with respect to an officer who is a graduate of the Academy, means the period beginning on the date of the officer's appointment as a commissioned officer and ending on the sixth anniversary of such appointment or, at the discretion of the Secretary, any later date up to the eighth anniversary of such appointment.

(f)(1) This section does not apply to a cadet who is not a citizen or national of the United States.
    (2) In the case of a cadet who is a minor and who has parents or a guardian, the cadet may sign the agreement required by subsection (b) only with the consent of the parent or guardian.

(g) A cadet or former cadet who does not fulfill the terms of the obligation to serve as specified under section (b), or the alternative obligation imposed under subsection (c), shall be subject to the repayment provisions of section 303a(e) of title 37.

Title 14 U.S.C. § 184 states that the "Superintendent of the Academy may, under such rules and regulations as the Secretary shall prescribe, confer the degree of bachelor of science upon all graduates of the Academy."

Title 14 U.S.C. § 185 states that the "President may, by and with the advice and consent of the Senate, appoint as ensigns in the Coast Guard all cadets who shall graduate from the Academy."

Title 14 U.S.C. § 631 states, "The Secretary is authorized to confer or impose upon the Commandant any of the rights, privileges, powers, or duties, in respect to the administration of the Coast Guard, vested in or imposed upon the Secretary by this title or other provisions of law."

Title 14 U.S.C. § 632 states, "All powers and functions conferred upon the Coast Guard, or the Commandant, by or pursuant to this title or any other law shall, unless otherwise specifically stated, be executed by the Commandant subject to the general supervision of the Secretary."

### DHS Management Directive 3330

DHS Management Directive 3330 (MD 3330), "Personnel Actions for the United States Coast Guard," is dated August 13, 2003, and states that its purpose is to establish "policy regarding Coast Guard officer personnel actions that require the Secretary's approval. These include appointments (commissions, promotions, and designations), resignations, retirements, revoking or vacating commissions, removals from the promotion list, involuntary separations, and other significant personnel actions effecting Coast Guard Regular and Reserve officers."

Part VI.A. of MD 3330 states, "For the President, the Secretary, by law, retains the authority and responsibility to appoint officers and to approve officer resignations in the Coast Guard and Coast Guard Reserve."

Part VI.B. of MD 3330 states that "[t]he Secretary delegates certain authorities prescribed in Titles 10 and 14, U.S. Code, to the Commandant of the United States Coast Guard. The following officer personnel management responsibilities are delegated," which is followed by a list of short phrases regarding the Secretary's authorities and the applicable statutes. Number 5 on this list is, "Retention of Coast Guard Academy graduates to complete their obligated commissioned service (14 U.S.C. 182)."

Part VI.C. states that the "Secretary approves personnel actions that may impact the national security of the United States, such as executing Title 10 recall of Reservists on behalf of the President in times of national emergency."

Part VI.D. states that the "Commandant has established applicable procedures concerning personnel actions in COMDTINST M1000.6 (series), Coast Guard Personnel Manual." (In 2011, the Personnel Manual was broken up into several smaller manuals, including Officer Accessions, Evaluations, and Promotions, COMDTINST M1000.3.)

### Coast Guard Regulations, COMDTINST M5000.3B

Article 2-1-1 of Coast Guard Regulations states, "The Commandant issues rules, orders, and instructions, consistent with law, that relate to the organization, internal administration, and personnel of the Coast Guard. (14 U.S.C. § 632)."

Article 3-1-5 states the following about the Superintendent of the Academy:

> A. The Superintendent of the Coast Guard Academy shall be assigned by the Commandant from the list of officers whose assignment to duty is not restricted by law. The Superintendent shall be responsible for the education and training of cadets; shall promulgate regulations for the Coast Guard Academy, with those regulations pertaining to the discipline and course of instruction of cadets being subject to the approval of the Commandant.
>
> • • •
>
> C. The Superintendent of the Coast Guard Academy is authorized to confer the degree of Bachelor of Science on all cadets who satisfactorily complete the entire course of instruction prescribed in the regulations for the Coast Guard Academy.

### Officer Accessions, Evaluations, and Promotions, COMDTINST M1000.3A

Article 1.E.1.a.(1) of COMDTINST M1000.3A (hereinafter "Officer Manual") states, "The Superintendent, U.S. Coast Guard Academy, is authorized to tender appointments as Cadet, U.S. Coast Guard the following about Academy cadets."

Article 1.E.2. lists the eligibility requirements for cadets, and Article 1.E.2.c. states that cadets "[m]ust be unmarried and have no legal obligations resulting from any previous marriage."

Article 1.E.4.e., "Hardship Readmission," states that "[f]ormer cadets who resigned due to unavoidable hardship which subsequently is resolved may be granted readmission. The Superintendent, Coast Guard Academy shall prescribe readmission requirements and procedures." Otherwise, the former cadet must re-compete for admission with other candidates. Article 1.E.4.d.

Article 1.E.4.h. and i. state the following about terminating a cadet's appointment:

h. The Superintendent, Coast Guard Academy has the authority to terminate a cadet's appointment on the recommendation of an Executive Board, the Dean of Academics, or the Commandant of Cadets. The decision by the Superintendent, Coast Guard Academy to dismiss a cadet may be appealed to Commandant (CG-1). The Superintendent, Coast Guard Academy shall prescribe the appeal procedures.

• • •

i. ... (2)(b) First and second class cadets who accepted an appointment without any prior obligation to the U.S. Armed Forces who resign, are disenrolled, or summarily dismissed transfer to the "Individual Ready Reserve" in the boatswain's mate second class or third class rating respectively (seaman if disenrolled due to suitability for service reasons), for a time equal to their time as a cadet. In special cases, if the Superintendent determines a cadet is not suited to any type of military service, they may recommend the Commandant give the cadet no reserve commitment or obligation.

### Regulations for the Corps of Cadets

The Regulations for the Corps of Cadets (RCC), SUPTINST M5215.2 (2011, Update 7), in effect in 2013 and 2014, states at § 1-1-03 that the mission of the Coast Guard Academy is

[t]o graduate young men and women with sound bodies, stout hearts, and alert minds, with a liking for the sea and its lore, and with that high sense of honor, loyalty and obedience which goes with trained initiative and leadership; well-grounded in seamanship, the sciences and amenities, and strong in the resolve to be worthy of the traditions of commissioned officers in the United States Coast Guard in the service of their country and humanity.

RCC § 1-1-04 describes the purpose of the Academy as follows:

The United States Coast Guard Academy exists to develop the future military leaders of the Coast Guard and provide the foundation for the professional development of the commissioned officer corps. It is dedicated to ensuring the quality and excellence of that foundation. To fulfill this commitment, the Academy must equip its commissioned graduates with the competence that will be needed for a long-term career in performing Coast Guard missions. Specifically, the Academy Cadet Program objectives are:

a. To provide, by precept and example, an environment which encourages a high sense of honor, devotion to duty and respect for others,

b. To provide a sound undergraduate education in a field of interest to the Coast Guard, and

c. To provide athletic, professional and military training which enables graduates to assume their duties, upon commissioning, in operational billets.

RCC § 2-4-01 of the cadet regulations states the following:

a. The Superintendent has the authority to terminate the appointment of a cadet and normally does so upon a recommendation from an Executive Board, the Dean of Academics, the Commandant of Cadets, Chief Medical Officer, or the Director of Health and Physical Education.

b. The Superintendent may effect a separation and characterize a discharge as either Honorable or General as circumstances dictate and in accordance with the Coast Guard Personnel Manual. The actual separation code that will be listed on the form DD-214 shall be included in the disenrollment letter from the Superintendent to the cadet.

c. The Superintendent may suspend a cadet ...

d. Cadets will normally be afforded due process in the form of a hearing before the Superintendent makes a decision to terminate a cadet's appointment. The hearing may be achieved by a personal appearance before the Superintendent, an Executive Board, a Suitability for Service Hearing, a Commandant of Cadets Class I Hearing or a Cadet Honor Board. The due process hearing is not required before the Superintendent takes action to disenroll a cadet whenever the cadet fails to maintain published minimum standards (e.g. academic standards, physical fitness score, medical standards, excessive demerits, body weight, marriage, pregnancy, etc.). In these cases, the Superintendent will examine the record and effect the disenrollment by letter if, in the Superintendent's opinion, the cadet does not meet the retention standards of the Academy.

RCC § 1-5-02 states that a cadet may appeal the Superintendent's decision to terminate his cade status by writing to Commandant (CG-1) within five working days.

RCC § 2-4-02 states that a "cadet may be recommended for disenrollment or termination of cadet status for failure to maintain standards or adhere to regulations" with regards to academics, suitability for service, medical standards, physical fitness, and swimming deficiencies.

RCC § 2-4-04.a. states the following regarding suitability for service deficiencies:

When a cadet is referred to the Superintendent for Unsuitability for Service with a recommendation for disenrollment, the Superintendent will take one or more of the following actions:

1. Disenroll the cadet;
2. Place the cadet on Suitability for Service Probation (for conduct, adaptability, performance, weight, etc.);
3. Award the cadet specific penalties;
4. Remand the cadet to the Commandant of Cadets for appropriate punishment;
5. Retain the cadet;
6. Convene an Executive Board to advise the Superintendent of a proposed course of action.
7. Recommend to the Commandant that the cadet be summarily dismissed.

RCC § 2-4-04.b. lists the reasons for which cadets may be disenrolled due to unsuitability. Number 7 on the list states the following:

Paternity/Maternity/Pregnancy. A cadet may not have any maternal or paternal obligation or responsibility at the time of appointment nor while enrolled as a cadet. Pregnancy past fourteen (14) weeks will be considered an obligation and will be applicable to both prospective parents. A cadet who incurs a maternal or paternal obligation may resign, be disenrolled, or may apply for a hardship resignation to return upon resolution of parental responsibilities.

RCC § 2-3-02 states that the Superintendent may accept the resignation of cadets due to hardship, such as the need to care for a family member due to a death or disability. They may later apply for readmission but because readmission is not guaranteed, they should make every effort to resolve hardships without resorting to resignation.

Under RCC § 2-6-03.b., when a first-class cadet's appointment is terminated, the cadet is normally transferred to the Reserve in an enlisted status as an E-3, but pursuant to § 2-6-04.a. the cadet may request to serve on active duty instead.

Case 3:21-cv-01631-VLB   Document 1-1   Filed 12/08/21   Page 21 of 38

Final Decision in BCMR Docket No. 2017-193

p. 19

RCC § 2-1-03, "Hardship Readmission," states the following:

a. Former cadets who resigned due to unavoidable hardship, which is subsequently resolved, may be granted readmission. However, the Academy does not guarantee readmission. Cadets should make every effort to resolve hardships without resorting to resignation.

b. Former cadets who wish to apply for hardship readmission may do so through the Admissions Office in consultation with the Commandant of Cadets. Applications for hardship readmission must be accompanied by proof that:

1. A hardship existed at the time of resignation and was the primary reason for the resignation; and

2. The hardship has been resolved and will, in all probability, not recur. This proof may be in statements from doctors, family, friends, and clergy or by official records.

RCC § 2-1-04.a. states that "[e]ligible former cadets may seek readmission to the Academy commencing within two years of their separation. See Chapters Two and Five of the Admissions Organization and Regulations Manual for policy and procedures related to readmission."

RCC § 4-5-03.c.1.(d) states the following about a cadet's honesty:

By words or acts of either commission or omission, a deceitful person intends to represent a fact to exist which is known to be otherwise. Such conduct displays an element of cowardice and a flaw in character which is inconsistent with the standards required of a Coast Guard officer. The daily routine at the Academy provides innumerable occasions for the deceitful person to practice guile. Inaccurate reporting of facts, musters, class attendance, signing of lists, etc., is an example of deceitful conduct. A person who is unwilling to be held accountable for actions and omissions within the cadet corps will most likely display the same weaknesses as an officer. This kind of unreliability is unacceptable in a Coast Guard which relies on honest and forthright reports from its commanders around the world.

## VIEWS OF THE COAST GUARD

On December 12, 2017, a judge advocate (JAG) of the Coast Guard submitted an advisory opinion in which she recommended that the Board deny relief. She adopted the findings and analysis in a memorandum on the case submitted by Commander, Personnel Service Center (PSC) and also argued the following:

- Although the applicant alleged that he had no duty to "incriminate" himself, parenthood is not a Class One offense so the right not to incriminate oneself of a criminal offense is inapplicable. In addition, the JAG argued, under Part 9, § 3-9-01.b. of the cadet regulations, the applicant had a duty to report the pregnancy within two weeks after he learned of it.[13] Moreover, because his fiancé was 19 weeks pregnant at the time, under the rules, the applicant already had parental obligations when he learned of the pregnancy. And the applicant waited almost a full year to report that he had parental obligations, even though the cadet regulations make clear that a pregnancy past 14 weeks constitutes a parental obligation whether the cadet is the mother or the father.

---

[13] The Coast Guard submitted pages that appear to be from the 2015 edition of the RCC, which contains the two-week deadline.

- Cadet regulations §§ 2-4-01.d., 2-4-04.b.7., 3-9-01.a., and 3-9-01.c.1. state that pregnancy and being responsible for the pregnancy of another create "significant responsibilities that are inconsistent with continued status as a cadet." The regulations also provide three options: voluntarily resign; request a hardship resignation to give birth and/or resolve matters of parental responsibility; or disenrollment. If the student requests a hardship resignation, he or she may apply for reinstatement after the hardship is resolved, which in such a case can be proven by "a certified court document or other legal documentation either certifying that the individual has no dependents and/or obligations of parenthood or that the individual has irrevocably surrendered his or her parental rights and obligations. [Citation omitted] None of the options listed in the cadet regulations contemplates that cadets can remain cadets while incurring parental obligations past 14 weeks. Each option, including the hardship resignation option, clearly contemplates that cadets will no longer be enrolled at the Academy upon having parental obligations."

- Under the California court order submitted by the applicant on April 24, 2014, the agreement was temporary and modifiable by either party at any time. The JAG argued that a temporary, unenforceable agreement does not meet the requirements of the cadet regulations, which require that the cadet no longer have any parental obligations by irrevocably surrendering his or her rights and obligations. The court order submitted by the applicant does not fulfill these requirements because it does not certify that he no longer had dependents or that he had irrevocably surrendered his rights and obligations. The JAG argued that neither the fiancé's notarized statement nor the court order irrevocably removed the applicant's status as having "parental obligations" and so he was ineligible to remain a cadet. She stated that his temporary custody agreements "fall far short of certifying that [he] had no dependents or had irrevocably surrendered his parental rights." Therefore, he continued to possess parental obligations and was subject to disenrollment.

The JAG concluded that the applicant was properly disenrolled from the Academy and that there was no error or injustice in his disenrollment.

PSC stated that the applicant was not "summarily dismissed," as he argued, but disenrolled and offered the opportunity to enlist. PSC stated that the Superintendent of the Academy "has the authority to involuntarily terminate the appointment of a cadet for failure to maintain standards or adhere to regulations for Suitability of Service deficiencies," one of which is having parental obligations. PSC stated that the applicant was ineligible for cadet status because of his parental obligations, and when a cadet fails to maintain a published minimum standard with respect to matters such as GPA, marriage, and pregnancy, no hearing is required. Instead, the Superintendent "will examine the record and effect the disenrollment by letter, if, in the Superintendent's opinion, the cadet does not meet the retention standards of the Academy." PSC stated that because the applicant did not maintain the published minimum standard of not having parental obligations, no hearing was required.

PSC stated with regards to the applicant's request for a bachelor's degree, that while the applicant completed the academic requirements, he was disenrolled, not graduated, based on his "ineligibility to remain a cadet due to parenthood." PSC stated that its policies in this regard are consistent with the Navy's in Commandant Midshipmen Instruction 1531.2B, which prohibits

attendance at the Naval Academy if a midshipman "is pregnant, is a parent, or otherwise has dependency obligations."

PSC submitted copies of some cadet regulations that appear to be from a different edition and appear in the 2015 edition. The regulations state that a cadet who is pregnant or responsible for the pregnancy of another should inform the Commandant of Cadets not later than two weeks after the diagnosis. The new regulations continue to state that parental obligations begin at the 14-week mark of the pregnancy and that the three options for cadets with parental obligations are voluntary resignation and disenrollment; requesting a hardship resignation until parental responsibilities are resolved and then requesting reinstatement; or being disenrolled for unsuitability for service. However, specific instructions now explain that when requesting reinstatement, the cadet should provide legal documentation showing that he or she has no dependents or obligations of parenthood or has irrevocably surrendered his or her parental rights and obligations.

## APPLICANT'S RESPONSE TO THE VIEWS OF THE COAST GUARD

On February 20, 2018, the applicant submitted his response to the advisory opinion. The applicant claimed that the Coast Guard's conclusion that he did not adequately resolve his parenthood relies on a 2015 rewrite of the regulations and that such an *ex post facto* application of regulations violates the applicant's due process rights. He stated that the Coast Guard entirely ignored the fact that the regulations were enforced without due process as the Superintendent summarily dismissed him without a hearing or meaningful opportunity to appeal. He also claimed that the Coast Guard refused to acknowledge that the Superintendent lacked the authority to issue the regulations and argued that only the Commandant could have authorized that regulation.

The applicant argued that the Coast Guard's contention that to promote good order and discipline at the Academy, it may force cadets to irrevocably surrender their own flesh and blood violates substantive due process rights. He argued that to require fathers to irrevocably give up their parental rights to remain a cadet or face dismissal, the loss of their diploma, and either recoupment of their educational costs or transfer to enlisted status is "indefensible." He argued that he had a fundamental liberty interest in raising his child and that, contrary to the Superintendent's claim, having him abandon his child—not allowing him to raise his child—would be contrary to good order and discipline at the Academy.

The applicant argued that he had in fact "resolved" his parental obligations as required by the 2011 cadet regulations because those regulations do not tell a cadet how to resolve such obligations. He argued that he resolved them to the best of his ability without resorting to resignation, as the regulations require. He also argued that the California court order definitely cured the problem by relieving him of all obligations toward his son.

The applicant alleged that revealing his parenthood could have led to a charge of conduct unbecoming an officer and gentleman under the UCMJ and so he reasonably believed that he did not have to "self-incriminate" by revealing his parenthood. He claimed that ensigns had been court-martialed under similar circumstances as recently as the 1960s.

The applicant repeated his argument that the rules regarding parenthood in the cadet regulations are *ultra vires*. He stated that the 1992 Coast Guard Regulations require the Commandant to approve Academy regulations "pertaining to the discipline and course of instruction of cadets," and there is no evidence that the Commandant approved the regulations about parenthood.

The applicant also argued that his dismissal by the Superintendent violated due process. He repeated his argument that his disenrollment constituted a "summary dismissal," pursuant to 14 U.S.C. § 182, and that only the Secretary has the power to summarily dismiss a cadet. He argued that he was entitled to a hearing at the Academy pursuant to decisions of the Second Circuit Court of Appeals, whose geographical jurisdiction includes the Coast Guard Academy, West Point, and the Merchant Marine Academy, in four cases:

- *Wasson v. Trowbridge*, 382 F.2d 807 (2d Cir. 1967).
- *Hagopian v. Knowlton*, 470 F.2d 201 (2d Cir. 1972).
- *O'Neil v. Dent*, 364 F. Supp. 565 (E.D.N.Y. 1973).
- *Crawford v. Cushman*, 531 F.2d (2d. Cir. 1975).

The applicant also repeated his argument that the Superintendent denied him a meaningful opportunity to appeal because he was not permitted to meet with her, to know what evidence she had considered, to know what evidence the faculty had sent her, or to know what evidence would be forwarded to Commandant (CG-1) for consideration with his appeal. Therefore, he argued, his ability to appeal was limited to an ability to write a letter without knowing what the six faculty and staff members, whose letters of support he had requested, actually said about him or what information the Superintendent would forward to Commandant (CG-1). The applicant also argued that the Superintendent's endorsement of his appeal suggests that she did not consider any of his evidence, including the six letters of support, his fiancé's affidavit, and the court order he submitted.

The applicant also complained that the separation code entered on his DD 214, JDG, indicates that his parenthood rendered him unable to perform his duties or unavailable to serve worldwide, which was not true, as shown by the fact that he was allowed to enlist when he was discharged from the Academy.

## FINDINGS AND CONCLUSIONS

The Board makes the following findings and conclusions on the basis of the applicant's military record and submissions, the Coast Guard's submission and applicable law:

1.      The Board has jurisdiction concerning this matter pursuant to 10 U.S.C. § 1552. Although the application was not filed within three years of the applicant's discovery of the alleged error or injustice in May 2014, it is timely because he has served on active duty in the interim.[14]

---

[14] *Detweiler v. Pena*, 38 F.3d 591, 598 (D.C. Cir. 1994) (holding that, under § 205 of the Soldiers' and Sailors' Civil Relief Act of 1940, the BCMR's three-year limitations period under 10 U.S.C. § 1552(b) is tolled during a member's active duty service).

2.     The applicant requested an oral hearing before the Board.  The Chair, acting pursu-
ant to 33 C.F.R. § 52.51, denied the request and recommended disposition of the case without a
hearing.  The Board concurs in that recommendation.[15]

3.     The applicant alleged that the Coast Guard's refusal to grant him a bachelor's
degree and officer's commission in May 2014 constitutes an error and injustice.  When considering
allegations of error and injustice, the Board begins its analysis by presuming that the disputed
information in the applicant's military record is correct as it appears in his record, and the applicant
bears the burden of proving by a preponderance of the evidence that the disputed information is
erroneous or unjust.[16]  Absent evidence to the contrary, the Board presumes that Coast Guard
officials and other Government employees have carried out their duties "correctly, lawfully, and
in good faith."[17]

4.     **Substantive Due Process**:  As explained below, the Board finds that the applicant
has not proven by a preponderance of the evidence that the prohibition on Coast Guard cadets
being parents constitutes a denial of substantive due process under the Constitution.

a.     The applicant argued that the Academy rule against parenthood for cadets
infringed on his right to substantive due process under the Constitution because he has constitu-
tionally protected interests in remaining a cadet while retaining custody of his child.  Military
members have no property interest in continued military service.[18]  A constitutionally protected
liberty interest must be both "fundamental" and "traditionally protected by our society."[19]  Parent-
hood (the right to custody of a child) is a fundamental liberty interest under most circumstances,[20]
but being a cadet is not.[21]  And because of the traditional prohibition on military cadets having
legal dependents (as the applicant described), whether a cadet's right to remain a cadet while
retaining custody of a child is an interest "traditionally protected by our society" is unclear.[22]  For
the purposes of this decision, however, the Board will assume, without finding, that a cadet has a
fundamental liberty interest in remaining a cadet while retaining custody of a child.[23]

---

[15] *Armstrong v. United States*, 205 Ct. Cl. 754, 764 (1974) (stating that a hearing is not required because BCMR
proceedings are non-adversarial and 10 U.S.C. § 1552 does not require them).

[16] 33 C.F.R. § 52.24 (placing the burdens of production and persuasion on the applicant).

[17] *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992); *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl.
1979).

[18] *Wilhelm v. Caldera*, 90 F.Supp.2d 3, 8 (D.D.C. 2000)

[19] *Michael H. v. Gerald D.*, 491 U.S. 110, 121-22 (1989).

[20] *See, e.g., Troxel v. Granville*, 530 U.S. 57, 66 (2000); *M.L.B. v. S.L.J.*, 519 U.S. 102, 103 (1996); *Quillion v. Walcott*,
434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child
is constitutionally protected."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *but see Michael H.*, 491 U.S. at 111
(finding that a biological father has no protected liberty interest in his parental relationship to a child born to a mother
married to another man because society and common law traditionally protected the marital family).

[21] *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572-73 (1972) (finding that a denial of employment did
not infringe on a teacher's liberty interest because the denial did not impose a stigma or other disability on the teacher).

[22] *See, e.g., Michael H.*, 491 U.S. at 111 (finding that a biological father has no protected liberty interest in his parental
relationship to a child born to a mother married to another man because society and common law traditionally
protected the marital family).

[23] *See O'Neil v. Dent*, 364 F. Supp. 565 (E.D.N.Y. 1973) (finding that a cadet at the Merchant Marine Academy had
a fundamental right to marry without being expelled).

      b.    The Government may not infringe upon a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling government interest.[24]  The applicant argued that that the Academy's absolute prohibition on parenthood is not narrowly tailored to serve a compelling government interest, but the Board disagrees.  As noted in § 1-1-03 of the Regulations for the Core of Cadets (RCC), the Academy is charged with producing a trained corps of officers with a "high sense of honor, loyalty and obedience."  To that end, it admits young people without loyalties and responsibilities to dependents (spouses and children)[25] and over the course of four years it requires them to develop devotion to their duty,[26] to learn to depend on and have complete trust in each other,[27] and to build an esprit de corps, integrity, honor, and loyalty to their Service and country that will last throughout their careers.[28]  The result every May is a cohesive class of newly commissioned ensigns who are ready for a three-year tour of duty afloat[29] and whose esprit de corps and loyalty is such that they will obey orders at great cost to both themselves and the families they later acquire;[30] they will entrust their lives to and risk their lives for each

---

[24] *Lawrence v. Texas,* 539 U.S. 558, 593 (2003).

[25] COMDTINST M1000.3A, Article 1.E.2.; RCC, § 2-4-04.b.

[26] *See* RCC, § 1-1-04; RCC, Regimental Commander's Supplement to the Cadet Regulations, § F-1-02; COMDTINST M1600.2, Chap. 2.A.1.a. ("The Coast Guard attracts and retains highly qualified people with commonly shared values of honor, respect and devotion to duty. These values anchor our cultural and Service norms and serve as a common foundation for our interpersonal relationships within the Coast Guard.").

[27] *See* RCC, Regimental Commander's Supplement to the Cadet Regulations, § 4-5-03.a.2. ("The personal and working relationship between cadet and cadet, between cadet and officer, and between officer and officer, must be founded upon mutual and complete trust and integrity. In closely knit societies, such as the Corps of Cadets and the Coast Guard Officer Corps, the relationships established at the Academy are lifelong. In order to establish the proper relationship among Coast Guard men and women, trust and integrity are absolute essentials."); U.S. Coast Guard Publication 1, p. 90 ("Our organization works on the basis of trust among our people; and in turn, their loyalty, sense of responsibility, and professionalism motivate each of us to excel.").

[28] *See* COMDTINST M1000.3A, Art. 1.E.4.a.(3) (stating that the Academy program "stimulates a high level of integrity, commitment, respect, discipline and camaraderie … that enables a graduate to assume duties immediately as a junior officer afloat."); RCC at § 4-5-03.b.1. (stating that rising above the society of regular society "the society of the Corps of Cadets departs for higher forms of ordered relationships which are considered necessary and appropriate for administering the community of the Coast Guard Academy and developing young men and women to assume their responsibilities as officers in the U.S. Coast Guard."); § 4-5-03.c.1.(d) ("A person who is unwilling to be held accountable for actions and omissions within the cadet corps will most likely display the same weaknesses as an officer. This kind of unreliability is unacceptable in a Coast Guard which relies on honest and forthright reports from its commanders around the world."); *see Hagopian v. Knowlton,* 470 F.2d 201, 205 (2d Cir. 1972) (noting that West Point teaches cadets "to be prepared to accept full responsibility for all that they do or fail to do and to place loyalty to the service above self-interest or loyalty to friends and associates.").

[29] COMDTINST M1000.3A, Art. 1.E.4.a.(3) (stating that the Academy program "stimulates a high level of integrity, commitment, respect, discipline and camaraderie … that enables a graduate to assume duties immediately as a junior officer afloat."); COMDTINST M1000.8A, Chap. 1.A.7.d. (stating that recent graduates of the Coast Guard Academy "should expect to complete their first tour afloat."); Chap. 1.A.4.a.(1) (showing that an afloat tour is three years).

[30] COMDTINST M1000.3A, Art. 1.E.4.a.(3) (stating that the Academy program "stimulates a high level of integrity, commitment, respect, discipline and camaraderie … that enables a graduate to assume duties immediately as a junior officer afloat."); COMDTINST M1000.8A, Chap. 1.A.4.a.(1) (showing that normal tour lengths range from eighteen months to four years); Chap. 1.A.1.a.(1) ("In distributing and assigning members, the needs of the service come first."); Chap. 1.A.5.a. ("[A]ll Coast Guard members [must] be available for unrestricted duty assignment worldwide."); Chap. 1.A.5.b. ("Because many Coast Guard assignments feature unusual or irregular working hours and calls to immediate duty remain an inevitable possibility, members often encounter difficulties in caring for dependents."); Chap. 1.A.5.c. ("It is manifestly unfair to implement the Commandant's unrestricted duty assignment

other in war and other hazardous situations;[31] and they will lead enlisted members by example in doing so. Their esprit de corps and the ties that bind their trust, obedience, and loyalty are established before they acquire ties to spouses and children and are strong enough to persist despite those subsequently acquired, competing loyalties and responsibilities towards spouses and children.[32] "The essence of military service 'is the subordination of the desires and interests of the individual to the needs of the service.'"[33] The need for such officers in the Coast Guard to lead the enlisted ranks could not be more compelling.

      c.     The Coast Guard stated that allowing cadets to have parental obligations would be contrary to "good order and discipline" within the corps of cadets but did not elaborate. Parenthood is not a disciplinary issue because it is not punished under either the UCMJ or the RCC, but it could be considered a matter of "good order." The record shows that the applicant's performance suffered significantly after he learned of his parental obligation in April 2013. His GPA fell and according to his supervisors, during his shipboard training that summer, he "barely met the standards set for the swabs" and "seem[ed] to choose when to perform based on when it [was] convenient." He was lucky enough to receive leave at the right time to attend the birth of his son on ▮▮▮▮▮▮▮▮▮▮▮▮▮ but because of his cadet duties, he did not see his son again until after he was disenrolled, except for briefly during the winter break.[34] The reason for this is clear in the RCC and the Regimental Commander's Supplement to the Cadet Regulations, which show that in addition to carrying a full academic load, cadets live in barracks, are required to perform numerous military and regimental duties on a daily basis, and may or may not be granted liberty and leave.[35] Cadets are also restricted in their phone usage and in the amount of debt they may incur.[36] "[W]ithin the military community there is simply not the same [individual] autonomy as there is

---

policy differently among service members. If for any reason a member is not available for unrestricted assignment for an appreciable period, the usual solution is separation from the service."); Chap. 1.A.5.d. (stating that the Coast Guard has the right to expect that having dependents will not interfere with an officer's performance of duty: "While COs and OICs should show sympathy and compassion for their members' problems, they also should insist on unrestricted availability for regular duties and watches.").

[31] U.S. Coast Guard Publication 1, pp. 86-87 ("We do dangerous work in hostile environments. Our heritage is based in large part on the selfless acts of courageous men and women who used their capabilities and their wits under hazardous conditions to save the lives of others. This tradition continues today as we perform duties that routinely place us in harm's way. ... We honor our heritage daily by casting off all lines or lifting off in severe weather. We accept the risk that comes with protecting our nation, saving lives, and rescuing property in peril. We understand the possibility that we may not come back.").

[32] See generally references cited in footnote 30 above (reflecting personal and familial sacrifices of all officers in following military careers, regardless of dependents). The fact that most cadets already have ties to parents and siblings does not change the analysis because such existing ties of loyalty are essentially unavoidable.

[33] Goldman v. Weinberger, 475 U.S. 503, 507 (quoting Orloff v. Willoughby, 345 U.S. 83, 92 (1953)).

[34] According to the applicant, for two weeks of the three-week winter break, he underwent extra shipboard training and assessment as part of his probation.

[35] See RCC, § 5-4-01 ("Daily Routine"); § 5-5-01 ("Liberty is a privilege authorized by the Superintendent and granted at the discretion of the Commandant of Cadets."); § 5-6 ("The Commandant of Cadets may authorize cadet leave" during periods prescribed by the Superintendent and for deaths or serious illnesses in the family); § 3-2-01.b.1.(f) (requiring four years of residence at the Academy); and see generally RCC, Regimental Commander's Supplement to the Cadet Regulations, including § F-1-02.d.1. ("Cadets must be physically present for all formations, evening reports and mandatory functions unless specifically excused by the Commandant of Cadets.").

[36] RCC, Regimental Commander's Supplement to the Cadet Regulations, §§ F-1-02.i. and aq.

in the larger civilian community."[37]  The numerous restrictions on cadets' time and autonomy would significantly interfere with parental obligations and vice versa unless cadets with parental obligations received special privileges, which would subvert the mission of the Academy by harming the esprit de corps and "good order."[38]

        d.      The applicant argued that the Academy's prohibition on cadets being parents does not withstand strict scrutiny because it is not narrowly tailored to achieve its purpose, but the Board disagrees.  In the applicant's view, a cadet who has a child and is able to show that he has made temporary, non-binding arrangements for someone else to take care of it should be deemed to have no parental obligations and so remain a cadet.  But whether you have a "parental obligation" is not a question of how much (or little) attention you pay to your child, whether you support it financially, or what impact it has on your personal performance.  And the rules must be applied evenhandedly.  Allowing some cadets to keep their children—likely those with the family resources to care for the children—while disallowing others would do substantial harm to morale and the esprit de corps.[39]  And the applicant's argument ignores the emotional ties and distractions of parenthood that interfere with the Academy's goal of creating a corps of officers who will rely on and have complete trust in each other[40] and whose esprit de corps, devotion to duty, and loyalty will last throughout their careers and inspire them to obey orders at great cost to both themselves and the families they later acquire.  The Board notes in this regard that the applicant's own grade point average, which had been rising, dropped significantly after he learned of his fiancé's pregnancy in April 2013, and his military performance aboard the cutter that summer was so poor that he was placed on probation in the fall and given extra instruction and shipboard training.  Although he claimed that his problem in the summer of 2013 was just introversion, introversion had not stopped him from performing very well during his previous shipboard training periods, and his supervisors' CER comments in 2013 contradict his claim.  They wrote that that he

- had "barely met the standards set for the swabs";
- "was unable to learn indoc[trination]";
- "did not demonstrate initiative to improve";
- "seemed distracted whenever talking with upperclass as well";
- "seems to choose when to perform based on when it is convenient";
- "did not complete assigned tasking"; and
- "failed to involve himself with any work."

---

[37] *Goldman*, 475 U.S. at 507 (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974)).

[38] *United States on Behalf of U.S. Coast Guard v. Cerio*, 831 F. Supp. 530, 535 (finding that a trust awarding money to Academy science majors would fundamentally change the Academy based on the Commandant's testimony that the money would harm the esprit de corps of the cadets and thus subvert the mission of the Academy).

[39] *Id.*

[40] *See* RCC, Regimental Commander's Supplement to the Cadet Regulations, § 4-5-03.a.2. ("The personal and working relationship between cadet and cadet, between cadet and officer, and between officer and officer, must be founded upon mutual and complete trust and integrity.  In closely knit societies, such as the Corps of Cadets and the Coast Guard Officer Corps, the relationships established at the Academy are lifelong.  In order to establish the proper relationship among Coast Guard men and women, trust and integrity are absolute essentials."); U.S. Coast Guard Publication 1, p. 90 ("Our organization works on the basis of trust among our people; and in turn, their loyalty, sense of responsibility, and professionalism motivate each of us to excel.").

e.      The applicant argued that marriage and parenthood restrictions on employment have been struck down by courts in civilian life and that the decisions in *O'Neil v. Dent*, 364 F. Supp. 565 (E.D.N.Y. 1973), and *Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1975), show that the prohibition on cadets being parents violated his right to substantive due process. In *Crawford,* the court found that a Marine Corps regulation requiring the discharge of all pregnant marines violated their right to equal protection because marines were allowed to have children and the Marine Corps had not shown a rational basis for treating pregnancy differently than other temporary disabilities.[41]  The decision in *Crawford* does not persuade the Board that the prohibition on parental obligations at the Coast Guard Academy is unconstitutional, however.  The applicant has not shown that the Academy allows cadets to maintain other significant, distracting responsibilities that divide their attention and loyalties.

f.      In *O'Neil*, the court held that marriage was a fundamental right and applied strict scrutiny to find that the Government had not shown compelling grounds for an absolute prohibition on married cadets at the Merchant Marine Academy.[42]  The court held extensive evidentiary hearings and concluded that the Government had not shown that married cadets performed worse academically[43] and so had not proven that the absolute prohibition on marriage affecting all students regardless of age, maturity, or circumstance was required to meet that academy's goal.[44] In the absence of academic statistical evidence supporting the alleged need for the prohibition, the court found no "rational and reasonable relation of the regulations to legitimate military objectives."[45]  The court acknowledged that "military institutions are allowed a certain amount of latitude of discretion in order to properly discipline and train their members,"[46] but held that academy officials had failed to demonstrate a clear imperative for interfering in a cadet's right to marry. The court also wrote, however, that its decision did not require the academy to change its program and acknowledged that such a regulation based on other data or evidence might be valid:[47]  "The Court decides only that no such data or evidence has been adduced in this case,"[48] and so ordered the cadet to be reinstated.  In *O'Neil*, the court considered only evidence concerning the academic performance of the cadets.  Building the cadets' esprit de corps, trust, loyalty, obedience, and willingness to make personal and familial sacrifices throughout their careers and the impact of granting (or not granting) special privileges to cadets with dependents were not addressed.[49] Therefore, the decision in *O'Neil* does not persuade the Board that the prohibition against cadets having parental obligations is not necessary to fulfilling its mission.

---

[41] *Crawford v. Cushman*, 531 F.2d 1114, 1122-25 (2d Cir. 1975).

[42] *O'Neil v. Dent*, 364 F. Supp. 565, 579 (E.D.N.Y. 1973).

[43] *Id*. at 575-76.

[44] *Id*. at 574.

[45] *Id*. at 576.

[46] *Id*.

[47] *Id*. at 580.

[48] *Id*.

[49] Graduates of the Merchant Maritime Academy are members of the Naval Reserve but primarily take full-time civilian jobs in the maritime and transportation industry and so are not necessarily required to make the kind of personal and familial sacrifices that active duty military officers are regularly required to make.

5.     **Disenrollment vs. Summary Dismissal**:  The Board finds that the applicant was disenrolled from the Academy, and not summarily dismissed.  Although the applicant alleged that these terms mean the same thing and are used interchangeably by the Coast Guard, the Board disagrees.  The RCC never uses the terms interchangeably and always presents disenrollment and summary dismissal as distinct alternatives.[50]  The term "summary dismissal" connotes disgrace, and the RCC states that only the Commandant may summarily dismiss a cadet,[51] whereas the Superintendent may administratively disenroll a cadet for numerous reasons unrelated to misconduct, including parenthood.[52]  The fact that 14 U.S.C. § 182(a) authorizes the Commandant to make the disciplinary rules and authorizes the Secretary to summarily dismiss a cadet does not mean that every cadet administratively disenrolled from the Academy is summarily dismissed.[53]  For example, in accordance with 14 U.S.C. § 182(b), (c), and (g), a cadet who breaches an agreement signed upon admission may not be tendered a commission, may be transferred to the Reserve, or may be separated and charged for his or her educational expenses.  But the applicant did not submit copies of all the agreements he signed upon admission to show the Board what he agreed to.[54]

6.     **Authority to Disenroll**:  The Board finds that the applicant has not proven by a preponderance of the evidence that the Superintendent lacked authority to disenroll him.  Under 14 U.S.C. § 181, "Administration of the Academy," the Superintendent is "the immediate government and military command of the Coast Guard Academy … subject to the direction of the Commandant and under the general supervision of the Secretary."  And pursuant to Article 3-1-5.A. of Coast Guard Regulations, COMDTINST M5000.3B, the Commandant has directed the Superintendent to "promulgate regulations for the Coast Guard Academy," and only those regulations that pertain to discipline and the course of instruction are subject to approval by the Commandant.  Therefore, the Superintendent's rules about parenthood are not subject to approval by the Commandant because they do not pertain to discipline or the course of instruction.  Moreover, the Commandant has expressly authorized the Superintendent to both tender appointments to cadets and terminate those appointments.[55]  And under 14 U.S.C. § 184 and Article 3-1-5.C. of Coast Guard Regulations, the Superintendent may confer a degree upon a graduate who completes the program and so also may *not* confer a degree.  Together these statutes and regulations show that the Superintendent has the authority to issue regulations regarding who is eligible to remain a cadet and graduate with a degree and who is not and to disenroll those who are not eligible.[56]

---

[50] *See* RCC, §§ 1-5-03.f.1, 2-4-04.a., 2-6-03.b.2., and 4-4-06.c.

[51] *Id.* at § 2-4-04.a.7.

[52] *Id.* at § 2-4-02 (authorizing disenrollment for lack of physical fitness or inability to swim); § 2-4-04.b. (authorizing disenrollment for lack of adaptability, failing weight standards, failing physical fitness tests, inability to swim, marriage, and parenthood); Coast Guard Medical Manual, COMDTINST M6000.1E, Chap. 3.D. (listing medical standards for which a cadet might be administratively separated, including obesity, eating disorders, attention deficit hyperactivity disorders, adjustment disorders, personality disorders, enuresis (bedwetting), and somnambulism).

[53] *See, e.g.,* 10 U.S.C. §§ 6961, 6962, 6963 (distinguishing dismissal and discharge authorities for midshipmen at the Naval Academy).

[54] 33 C.F.R. § 52.24 (placing the burden of production and persuasion on the applicant).

[55] COMDTINST M1000.3A, Articles 1.E.1.a.(1) and 1.E.4.h.

[56] *See Greer v. Spock,* 424 U.S. 828, 840 (1976) ("There is nothing in the Constitution that disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command."); *Chappell v. Wallace,* 462 U.S. 296, 302 (1983) ("The complex, subtle, and

Even if the statutory authority to separate cadets were found to lie with the Secretary in 14 U.S.C. § 182, the Board finds that the Secretary has delegated his authority under that statute. Paragraph (d) of § 182 authorizes the Secretary to prescribe regulations to carry out § 182; 14 U.S.C. § 631 authorizes the Secretary to delegate any of his authorities under Title 14; and paragraph 5 of Part VI.B. of MD 3330, "Personnel Actions for the United States Coast Guard," signed by then Secretary Ridge on August 13, 2003, delegates the Secretary's authority under 14 U.S.C. § 182 to the Commandant. Although the applicant argued that MD 3330 delegates only the authority to retain graduates to complete their commissioned service, the construction of MD 3330 shows that the Secretary delegated his authorities in the statutes listed in Part VI.B., including 14 U.S.C. § 182, to the Commandant and specifically retained the authority to appoint and approve the resignations of officers (Part VI.A.) and to approve those personnel actions that might impact national security (Part VI.B.). Each statute listed in Part VI.B. is introduced by a phrase generally describing the content of the statute—not limiting the delegation—and the authority to decide who should be retained inherently includes the authority to decide who should not be retained.[57] Therefore, the Board finds that in MD 3330 the Secretary has delegated his authority under 14 U.S.C. § 182 to the Commandant, who has in turn delegated the authority to make regulations, appoint cadets, and terminate cadet appointments to the Superintendent.[58]

7.    **Failure to Comply with RCC**:  The applicant has not proven by a preponderance of the evidence that he complied with the Regulations for the Corps of Cadets regarding parental obligations in effect in 2013 and 2014:

a.    Under § 2-4-04.b.7. of the RCC "[a] cadet may not have any maternal or paternal obligation or responsibility at the time of appointment nor while enrolled as a cadet. Pregnancy past fourteen (14) weeks will be considered an obligation and will be applicable to both prospective parents. A cadet who incurs a maternal or paternal obligation may resign, be disenrolled, or may apply for a hardship resignation to return upon resolution of parental responsibilities." The applicant argued that he reasonably interpreted this language as permissive, but the Board disagrees. The "may" in the first sentence is a clear prohibition. The "may" in the third sentence presents the three authorized outcomes, none of which is hiding a parental obligation and legal dependent from the Service for almost a year. The Board is not persuaded that the applicant failed to understand the prohibition on parental obligations in § 2-4-04.b.7.

b.    Under RCC § 2-4-04.b.7., when the applicant learned in April 2013 that his fiancé was more than 14 weeks pregnant, he immediately had a parental obligation, and he knew he had three options: to resign, to be disenrolled, or to apply for a hardship discharge and then apply for readmission after resolving his "parental responsibilities." Instead of following this rule, however, he carefully and thoroughly hid his child even from his own family and continued his military training and education through another summer and academic year even though he knew he was no longer eligible to be a cadet.

---

professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.").

[57] With regards to the meaning of "retention" encompassing non-retention in the military, the Board notes that the boards used by the Secretary to mandatorily retire members are called Career Retention Screening Panels (CRSPs).

[58] Coast Guard Regulations, Article 3-1-5; COMDTINST M1000.3A, Articles 1.E.1.a. and 1.E.4.h.

      c.     The applicant alleged that his silence about his parental obligation was proper because he was not required to "incriminate" himself, but neither the Uniform Code of Military Justice nor § 2-4-04.b.7. of the RCC makes paternal obligations a criminal offense and so the Fifth Amendment right not to incriminate oneself did not apply.  His argument that he could have reasonably anticipated prosecution for conduct unbecoming an officer and gentleman under Article 133 of the UCMJ because two ensigns were court-martialed "under similar circumstances in the 1960s"—fifty years ago—is not persuasive, and he did not claim to have known about those court-martials while he was at the Academy.  Although as the applicant noted, the rule requiring a cadet to inform his chain of command of a parental obligation within two weeks of discovery was apparently not in effect in 2013 and 2014,[59] the three options under § 2-4-04.b.7. were in effect.  All three require the cadet to resign or be disenrolled, and so the applicant clearly knew that as a father he was no longer eligible to be a cadet.  Otherwise, he would not have hidden the pregnancy and his child so thoroughly.  Although the two-week deadline was not in effect in April 2013, he knew that as a cadet, he was required to obey the rules and be honest and forthright and that omissions of the truth were not acceptable.[60]

      d.     The applicant argued that he acted properly and reasonably under the RCC in 2013 by trying to resolve his paternal obligation pursuant to § 2-3-02 before requesting a hardship discharge in accordance with his options under § 2-4-04.b.7.  However, § 2-4-04.b.7. states that a cadet with an existing parental obligation may "apply for a hardship resignation *to return upon resolution of parental responsibilities*" (emphasis added), showing that with respect to parental obligations the resolution is expected to occur after the cadet's resignation—not while the cadet hides his parental obligation and ineligibility for cadet status for many months while making no effort whatsoever to resolve them.  The record shows that the applicant did nothing whatsoever to try to resolve his parental obligation in 2013.  Instead, he asked his fiancé to keep it a secret, gave her some money and a car, attended the birth, and visited them briefly over the winter break.

      e.     The applicant argued that he reasonably resolved his parental obligation in 2014 before graduation.  First, he argued that he resolved his parental obligation by having his fiancé sign a notarized statement absolving him "from all parental rights and responsibilities while enrolled at the Coast Guard Academy.  This includes the right to make decisions for the child, the duty to care for the child, and all financial responsibility including child support payment."  But a parental obligation is an obligation to the child, not to the other parent of the child, and so the applicant's fiancé could never absolve him of his obligation to his child.[61]  Second, he argued that the court order signed on April 24, 2014, absolved him of his parental obligation, but a California court lacks the authority to relieve a parent of his obligation to support a minor child unless the

---

[59] The two-week rule does not appear in the Update 7 edition of the 2011 RCC, published in 2013, and only that edition and the 2015 edition (which does include the two-week rule) are available to the Board.

[60] RCC, § 4-5-03.c.1.(d).

[61] CAL. FAM. CODE § 3900 (1994) ("the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances"); *Kristine M. v. David P.,* 135 Cal. App. 4th 783, 789 (Cal. Ct. App., 2006) (holding that "public policy also prohibits a parent from waiving or limiting, by agreement, a child's right to support").

child is adopted by someone else.[62]   In *Kristine M. v. David P.,* 135 Cal. App. 4th 783, 786 (Cal. Ct. App., 2006), the court noted only adoption as a legal procedure that could have ended the defendant's duty to support an existing minor child[63] and wrote,

> [C]an parents nonetheless ask the court to terminate the father's parental rights pursuant to their stipulation and as a matter of convenience in order to guarantee that contact between the father and child will end as will the father's obligation to support the child in the future? The answer is "No." Public policy intervenes to protect the child's continued right to support. A judgment so terminating parental rights and the attendant obligation to support the child is void as a breach of public policy and as an act in excess of the court's jurisdiction.[[64]]

Therefore, neither his fiancé's affidavit nor the court order removed the applicant's parental obligation towards his son.

   f.   The applicant argued that in the absence of any written instructions in the RCC about how to resolve the "hardship" of parenthood, he reasonably believed he had rid himself of his parental obligation in the spring of 2014 by having his fiancé sign the affidavit and getting the court order.  This argument ignores the fact that the applicant failed to make any attempt whatsoever to resolve his parental obligation from April 2013 to March 2014 and was ineligible to be a cadet during that entire period.  Moreover, the Board is not persuaded that in 2013 and 2014 the applicant was unaware that, if his fiancé gave birth, his choices were limited to those listed in RCC § 2-4-04.b.  He never denied that the Academy warned him upon admission of the choice he faced if he became a parent before graduation; a simple online search reveals what that choice is; and he had the RCC.  The fact that the applicant made no attempts at all to relieve himself of his parental obligation in 2013 and just tried to hide it shows that he knew his choices under the RCC and rejected them.

   8.   **Lack of a Hearing:**  As explained below, the applicant has not proven by a preponderance of the evidence that he was denied constitutionally required procedural due process pursuant to his disenrollment:

   a.   The applicant's chain of command followed the procedures established for disenrolling a cadet from the Coast Guard Academy for failing to maintain published minimum standards.  After he revealed his parental obligation, which was prohibited by § 2-4-04.b.7. of the RCC, the applicant was allowed to meet with the Commandant of Cadets, who subsequently recommended his disenrollment on April 11, 2014, in accordance with §§ 2-4-02. and 2-4-04.b.7. Upon receiving this recommendation, the Superintendent informed the applicant in writing on April 14, 2014, that he was being disenrolled due to the parental obligation he had had since April 2013 and that he had a right to appeal to CG-1 within five working days in accordance with RCC § 1-5-02. The applicant was granted a short extension and submitted his appeal on April 22, 2014, along with confidential letters of support that he had requested from faculty and staff at the

---

[62] CAL. FAM. CODE § 8617 (1994) ("the existing parent or parents of an adopted child are, from the time of adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right to the child").

[63] *Kristine M. v. David P.,* 135 Cal. App. 4th 783, 789 (Cal. Ct. App., 2006) (noting that upon the adoption of a minor child, the birth parents normally are "relieved of all parental duties towards, and all responsibility for, the adopted child").

[64] *Id.* at 786.

Academy. The Superintendent forwarded his appeal to CG-1, explaining that the applicant had been ineligible for cadet status throughout his final year at the Academy. She recommended that he be disenrolled based on his parental obligation but allowed to enlist and subsequently compete to attend Officer Candidate School. On May 14, 2014, a week before graduation, CG-1 denied the applicant's appeal and noted that the applicant should be allowed to complete his courses (so he received the academic credits for his final semester) but not be awarded a degree or receive a commission.

b.      The applicant argued that he was entitled to a hearing before a board or the Superintendent under the RCC. But he was allowed to meet with the Commandant of Cadets, who nonetheless recommended his disenrollment, and § 2-4-01.d. of the RCC explicitly states that a "due process hearing is not required before the Superintendent takes action to disenroll a cadet whenever the cadet fails to maintain published minimum standards (e.g., academic standards, … marriage, pregnancy, etc.) In these cases, the Superintendent will examine the record and effect the disenrollment by letter if, in the Superintendent's opinion, the cadet does not meet the retention standards of the Academy."

c.      The applicant argued that the exception in § 2-4-01.d. of the RCC does not meet the due process requirements of the Fifth Amendment under applicable case law, but the Board disagrees. The applicant relied on the decisions in *Wasson v. Trowbridge*, 382 F.2d 807 (2d Cir. 1967), and *Hagopian v. Knowlton*, 470 F.2d 201 (2d Cir. 1972), both of which found that cadets being disenrolled for misconduct were entitled to hearings. In *Wasson*, the court found that a cadet at the Merchant Marine Academy was entitled to a fair hearing—which included being apprised of the charges and allowed to present a defense—because the board was investigating his alleged leadership of "'an unauthorized mass movement' of his fellow students, the object of which was to throw a Cadet Regimental Officer into Long Island Sound."[65] In *Hagopian*, the court held that a hearing was required for a cadet being separated from West Point because the board that reviewed the plaintiff's case had to decide both whether he had "accumulated an excessive amount of validly awarded demerits" during the semester and whether his "potential warrant[ed] retention."[66] An in-person hearing was required because the testimony of the plaintiff would allow the board to assess the plaintiff's credibility and claims regarding the alleged misconduct and could have changed the outcome.[67] In the applicant's case, however, his credibility was not at issue. The only issue was whether he had a parental obligation, which was proven by the birth certificate, his own admission in a meeting with the Commandant of Cadets that he was the father of his fiancé's son, and the lack of any adoption. The applicant alleged that he should have been allowed to meet with the Superintendent or appear before a board to argue that he had already resolved his parental obligation, but he was allowed to meet with the Commandant of Cadets and by law the only way he could have shown that he had no parental obligation was to have his son adopted, which had not happened.[68] Nor has he alleged or shown that an adoption was ever underway. Therefore, an in-person hearing, in lieu of or in addition to his written appeal, could not have

---

[65] *Wasson v. Trowbridge*, 382 F.2d 807, 810 (2d Cir. 1967).

[66] *Hagopian v. Knowlton*, 470 F.2d 201, 211 (2d Cir. 1972) (overruled on other grounds).

[67] *Id.* at 211.

[68] *Kristine M.*, 135 Cal. App. 4th at 786.

affected the determination that he had had a parental obligation since April 2013 and so was ineligible for cadet status throughout his final year at the Academy. Therefore, the Board finds that the decisions in *Wasson* and *Hagopian* do not show that he was entitled to a hearing regarding whether he had a parental obligation because it was a legal fact.

        d.     The applicant also argued that beyond meeting with the Commandant of Cadets, he was entitled to a hearing before the Superintendent or a board pursuant to the court's decision in *Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1975). In *Crawford*, the court held that a Marine Corps rule requiring all pregnant active duty members to be discharged was invalid on both equal protection (see finding 4.e. above) and due process grounds.[69] After finding that the rule violated the pregnant marines' right to equal protection because they were not treated the same as members with other temporary disabilities,[70] the court found that like other marines with temporary disabilities, female marines were entitled to individual review of whether they were fit for duty while pregnant and after giving birth. Pregnant marines and new mothers may or may not be fit for duty, as the court found in *Crawford*.[71] But a baby is a baby, creating parental obligations unless adopted by someone else, and so a parental obligation exists regardless of any temporary, non-binding agreements about custody and financial support between the parents. And as noted above, whether you have a "parental obligation" is not a question of how much (or how little) attention you pay to your child, whether you support the child financially, or what impact the parenthood has on your personal performance. Therefore, the applicant has not shown that he was entitled to an individual, in-person hearing before the Superintendent or a board. Nor has he shown that if he had been allowed to meet with the Superintendent or appear before a board, the outcome could have been different because he had had a parental obligation since April 2013 and throughout his final year at the Academy and he still had one when he was disenrolled.

        9.    **Meaningful Appeal**: The Board finds that the applicant has not proven by a preponderance of the evidence that he was denied a meaningful opportunity to appeal his disenrollment. He was informed of his right to appeal to CG-1, the Assistant Commandant for Human Resources, within five working days and given a short extension to submit his appeal. He argued that his right to appeal was not meaningful because he had no idea what information the Superintendent considered, but in her letter to him dated April 14, 2014, the Superintendent told him that the basis for his discharge was his revelation that he was a father, as shown on his son's birth certificate, and had had a parental obligation since April 2013. That was the sole grounds for his disenrollment, as stated in the Superintendent's letter to CG-1 dated April 25, 2014, and the applicant was told that. The applicant was allowed to submit documentation with his appeal, such as his fiancé's affidavit, on April 22, 2014. He was also told that he could submit "any subsequent changes to present parental obligations … for consideration," and the Superintendent did not forward the appeal package until after he submitted the court order on April 24, 2014. The Superintendent acknowledged his attempt "to try to legally separate himself from the dependency" in her memorandum forwarding his appeal package to CG-1 on April 25, 2014. Her memorandum does not discuss any part of the applicant's appeal, including the subsequent court order, but the

---

[69] *Crawford v. Cushman*, 531 F.2d 1114, 1121 (2d Cir. 1975).

[70] *Id.* at 1124.

[71] *Id.*

Board will not presume that she failed to forward it to CG-1.[72] Even assuming *arguendo* that she did not send the California court order to CG-1, the court order did not relieve the applicant of his parental obligation[73] and so could not have had any effect on his appeal. The applicant also argued that he should have been allowed to see what faculty and staff members said about him in their letters, but the applicant himself requested that they submit those confidential letters on his behalf, and in *Wasson v. Trowbridge*, 382 F.2d 807, 813 (2d Cir. 1967), the court found that the plaintiff was "not entitled to see the confidential opinions of members of the faculty."

    10. **Denial of Diploma and Commission**: The applicant argued that he should have graduated and received his diploma and commission because he completed all of the requirements for graduation. The record shows that after revealing his parenthood and ineligibility for cadet status on March 24, 2014, the applicant was notified of his disenrollment but allowed to complete his academic courses. Therefore, he received the academic credits, which he can transfer to another school. But the applicant had been ineligible for cadet status since April 2013. Although he managed to delay his disenrollment by hiding his parenthood, he was disenrolled from the Academy before graduation. The applicant has not shown that he was legally entitled to graduate with a diploma or to receive a commission after being disenrolled from the Academy, and the Superintendent had the authority not to graduate the applicant or award him a diploma.[74] The Board finds that the applicant has not proven by a preponderance of the evidence that the Coast Guard committed error or injustice by refusing to award him a diploma and commission even though he was allowed to complete and receive academic credit for his final classes.

    11. **Separation Code**: The applicant alleged that the separation code on his DD 214, JDG, is erroneous. According to the SPD Handbook, the JGD separation code means that the member is being involuntarily discharged "when as a result of parenthood or custody of minor children [the member is] subject to inability to perform prescribed duties, repetitive absenteeism, or nonavailability for worldwide assignment." In this case, the applicant's parenthood rendered him ineligible to serve as a cadet—his prescribed duty at the Academy. Because he was ineligible for cadet status, he could not serve as a cadet, and so he was legally unable to perform his prescribed duties. The Board finds that the JDG code is accurate.

    12. **The Interests of Justice**: The result of the Academy rule has been very harsh for the applicant, but the Board finds that it does not constitute an injustice[75] because the applicant knew upon admission to the Academy of the consequences of becoming a parent before graduation, and the outcome could have been different if he had timely revealed his parental obligation

---

[72] 33 C.F.R. § 52.24(b).

[73] *Kristine M. v. David P.*, 135 Cal. App. 4th 783 (Cal. Ct. App., 2006) ("[C]an parents nonetheless ask the court to terminate the father's parental rights pursuant to their stipulation and as a matter of convenience in order to guarantee that contact between the father and child will end as will the father's obligation to support the child in the future? The answer is "No." Public policy intervenes to protect the child's continued right to support. A judgment so terminating parental rights and the attendant obligation to support the child is void as a breach of public policy and as an act in excess of the court's jurisdiction.").

[74] 14 U.S.C. § 184; Coast Guard Regulations, Art. 3-1-5.C. (stating that the Superintendent *may* confer a degree upon a graduate who completes the program).

[75] *Reale v. United States*, 208 Ct. Cl. 1010, 1011 (1976) (finding that for the purposes of the correction boards under 10 U.S.C. § 1552, "injustice" is "treatment by the military authorities that shocks the sense of justice but is not technically illegal.").

**Final Decision in BCMR Docket No. 2017-193**                                     p. 35

in April or May 2013 and sought the advice of Academy officials about how to request a hardship discharge, resolve his parental responsibilities, and return to the Academy in accordance with RCC §§ 2-4-04.b. and 2-3-02. The applicant himself claimed that other military cadets have managed to return to their academies after resolving parental responsibilities. Instead of handling the problem forthrightly, however, he attended his fourth year at the Academy knowing that he was ineligible. Although the Superintendent disenrolled him based only on his ineligibility, rather than misconduct, his long-term lack of candor was clearly inconsistent with the behavior expected of a cadet.[76]

13.     The Board concludes that the applicant has not proven by a preponderance of the evidence that his disenrollment from the Academy was erroneous or unjust. He has not shown that the Coast Guard erred in determining that the prohibition on parental obligations is necessary because they interfere with the Academy's mission given the need for officers whose esprit de corps, trust in each other, loyalty, devotion to duty, and willingness to make tremendous personal and familial sacrifices will last throughout their careers. He has not justified his decision to hide his dependent child for almost a year nor shown that he ever resolved his parental obligations while at the Academy. Although his parental obligations resulted in his not receiving a diploma or commission through the Academy, the applicant received extremely valuable education and training free of charge; there are other ways for him to receive a commission as an enlisted member (as the Superintendent recommended);[77] and he may transfer his credits to receive a degree from another school. Accordingly, the Board finds that the applicant's requests for relief should be denied.

**(ORDER AND SIGNATURES ON NEXT PAGE)**

---

[76] RCC, Regimental Commander's Supplement to the Cadet Regulations, § 4-5-03.c.1.(d) ("A person who is unwilling to be held accountable for actions and omissions within the cadet corps will most likely display the same weaknesses as an officer. This kind of unreliability is unacceptable in a Coast Guard which relies on honest and forthright reports from its commanders around the world.").

[77] COMDTINST M1000.3A, Art. 1.B.5.a.(1) ("Officer Candidate School (OCS) is a major source of newly commissioned Coast Guard officers. The service selects candidates based on a competitive system. Upon satisfactorily completing 17 weeks of training, graduates are appointed as commissioned Coast Guard ensigns or lieutenants (junior grade) under the provisions of Article 1.A.3. of this Manual or commissioned Coast Guard Reserve ensigns under this Article's provisions.").

## ORDER

The application of AMT3 Isaak E. Olson, ████████ USCG, for correction of his military record is denied.


August 23, 2018

Virginia G. Farrier


Frank E. Howard


Matthew J. Slowik